MCI TELECOMMUNICATIONS
CORPORATION, Plaintiff,

v.

AMERI–TEL, INC., Defendant.

No. 91 C 4277.

United States District Court,
N.D. Illinois,
Eastern Division.

May 10, 1994.

Eddie M. Pope, Dallas, TX, for plaintiff.

Lauren Tashma, John C. Benz, Brian W. Lewis, Wildman, Harrold, Allen & Dixon, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Pursuant to Fed.R.Civ.P. 56, Plaintiff MCI Telecommunications Corporation ("MCI") moves this court for summary judgment against Defendant Ameri–Tel, Inc. ("Ameri–Tel") on its claim that Ameri–Tel owes $124,-064.84 for certain long-distance telephone services provided by MCI. Pursuant to the primary jurisdiction doctrine, Ameri–Tel contends that the Federal Communications Commission ("FCC") should have the first opportunity to review the issues presented by this suit. Ameri–Tel also argues that

genuine issues of material fact exist that preclude summary judgment for MCI. For the following reasons, we will grant Plaintiff's motion for summary judgment.

### BACKGROUND AND SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, we must view the record and all inferences to be drawn in the light most favorable to the non-movant. *Holland v. Jefferson Nat'l. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989); *Beard v. Whitley County REMC*, 840 F.2d 405, 409–410 (7th Cir.1988). The movant bears the initial burden of showing with the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c).

When faced with a motion for summary judgment, the non-movant may not rest upon the mere allegations or denials of its pleadings; instead, it must respond by setting forth specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 687 (7th Cir.1991); *Skagen v. Sears Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989). The non-movant can only satisfy its burden by "affirmatively demonstrat[ing] that there is a genuine issue of material fact which requires trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beard*, 840 F.2d at 410.

In this district, both the movant and non-movant are governed by strict rules concerning the setting forth of material facts. Local Rule 12(M) requires the movant to articulate precisely the "material facts as to which [it] contends there is no genuine issue ... including ... specific reference to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth...." The non-movant must then file

> a concise response to the movant's statement ... including in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and ... a statement ... of any additional facts which require the denial of summary judgment, including reference to the affidavits, parts of the record, and other supporting materials relied upon. *All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party.*

Local Rule 12(N) (emphasis added). MCI has complied with Local Rule 12(M); however, Ameri–Tel has not submitted a response pursuant to Local Rule 12(N). The consequences of that failure are clear and we follow the long line of precedent that holds parties to the mandate of Local Rule 12.[1] As dictated by Local Rule 12(N), all of the properly supported facts set forth by MCI in its Rule 12(M) statement are deemed admitted by Ameri–Tel. The Court will not consider the additional facts offered by Ameri–Tel in its briefs or as exhibits to its briefs because it failed to file a Local Rule 12(N) statement.

MCI, a Delaware corporation, is a provider of interstate telecommunications services to individual and corporate users. One of its corporate users was Ameri–Tel, an Illinois corporation owning and operating coin-operated pay telephones. Between December 1989 and January 26, 1991, MCI provided long-distance telephone service to Ameri–Tel pursuant to MCI F.C.C. Tariff No. 1 ("Tariff"), which was filed with the FCC in accordance with the Communications Act of 1934,

---

1. "Judges in the Northern District of Illinois have strictly applied Local Rule 12(n) and its predecessors ... for a number of years." *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 518 (7th Cir.1992). The Seventh Circuit repeatedly has upheld the strict application of Rule 12(M) and 12(N). *See, e.g., Appley v. West*, 929 F.2d 1176, 1179–80 (7th Cir.1991); *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101 (7th Cir.1990); *Skagen*, 910 F.2d at 1500.

47 U.S.C. § 151 *et seq.* (1982) (the "Act"). On January 26, 1991, MCI discontinued servicing Ameri–Tel when it refused to pay for international calls placed on Ameri–Tel-operated telephones using MCI long-distance service.

In August 1991, MCI filed an amended complaint, seeking collection under 47 U.S.C. § 203 (1982) of $38,622.71 for telecommunications services it provided for certain Ameri–Tel telephones, plus reasonable attorneys' fees and costs. On July 10, 1992, MCI filed a second amended complaint, demanding payment by Ameri–Tel of $128,923.84 for the long-distance services in question. In its Answer to MCI's second amended complaint, Ameri–Tel listed six accounts charged by MCI that it maintained were not operated under any agreement or contract with MCI. The charges attributable to those accounts totaled $4,859.00. For the purposes of this motion, MCI does not dispute these charges and has deleted the amount from its claim, leaving the total claim for unpaid services at $124,064.84 plus attorneys' fees and costs.

Ameri–Tel defends its refusal to pay by relying on an arrangement it allegedly reached with Illinois Bell, MCI's billing agent, to block certain international direct dialed calls after June 1, 1990. Ameri–Tel claims to have taken advantage of call-blocking provided through a revision of an Illinois Bell tariff. Mervyn Dukatt, President and sole Executive Officer of Ameri–Tel, admits that he never discussed any international call-blocking arrangements with any MCI representative. Dukatt further admitted he was unaware of any factual basis for Ameri–Tel's affirmative defense that MCI should have blocked the calls in question by virtue of "transmission agreements" with Illinois Bell.

## DISCUSSION

Our analysis of MCI's motion for summary judgment is two-fold. Initially, the Court must determine whether there are issues which should first be decided by the FCC under the doctrine of primary jurisdiction. Only if this threshold inquiry suggests the inapplicability of primary jurisdiction to this case can this Court then decide MCI's motion on its merits.

### Primary Jurisdiction

The Supreme Court cogently explained the doctrine of primary jurisdiction in *U.S. v. Western Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956):

The doctrine of primary jurisdiction ... is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.... Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

Because of the nature of the doctrine and the variety of situations in which it might apply, there is no fixed standard or formula for its application. *Id.* at 64, 77 S.Ct. at 165.

 Instead, a court should consider whether application of the doctrine would promote uniformity in statutory or regulatory construction and involve the use of the agency's special expertise and procedural flexibility and whether complex policy determinations are at issue. *Id.* at 64–67, 77 S.Ct. at 165–167. As the Court explained, "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Id.* at 64, 77 S.Ct. at 165; *see also Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir.1991). Finally, we note that "primary jurisdiction serves judicial economy because the dispute may be decided within the agency, thus obviating the need for the courts to intervene." *Id.* (citing *Christian v. New York State Dept. of Labor*, 414 U.S. 614, 622, 94 S.Ct. 747, 751, 39 L.Ed.2d 38 (1974)).

Several courts have gone a step further in distilling the primary jurisdiction doctrine. While continuing to recognize that no set

formula exists for applying it, they list four factors generally considered by the courts when determining if application of the doctrine is appropriate. These are:

1. Whether the question at issue is one within the conventional experience of the judges;

2. Whether the question at issue lies peculiarly within the agency's discretion or requires the exercise of agency expertise;

3. Whether there exists a danger of inconsistent rulings disruptive of a statutory scheme; and

4. Whether a prior application to the agency has been made.

*See, e.g., Oasis Petroleum Corp. v. U.S. Dept. of Energy,* 718 F.2d 1558, 1564 (Temp.Ct.Emer.App.1983) (citations omitted).

█ Courts have been reluctant to invoke primary jurisdiction "where the nature of the action deems application of the doctrine inappropriate." *U.S. v. McDonnell Douglas Corp.,* 751 F.2d 220, 224 (8th Cir.1984) (quoting *Mississippi Power & Light Co. v. United Gas Pipeline Co.,* 532 F.2d 412, 419 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977)). The court in *Mississippi Power & Light Co.* was especially concerned with the potential for added expense and delay to the parties caused by a stay of district court proceedings pending administrative action. 532 F.2d at 419. In general, courts "must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible." *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 686, 85 S.Ct. 1596, 1600, 14 L.Ed.2d 640 (1965). With these considerations in mind, we now analyze whether application of the doctrine is appropriate in this case.

According to MCI, this is a simple collection case involving a common application of the filed rate doctrine. In contrast, Ameri-Tel views the case as one involving complicated issues of federal telecommunications policy, intricate details of telecommunications technology, and the growing problem of toll fraud. Ameri-Tel engages in an extensive discussion to support its view of the importance of FCC action in this case.

We begin our discussion with some observations. In its argument, Ameri-Tel neglects to consider the impact of its failure to raise any issues with respect to MCI's Tariff or its practices by way of counterclaim or affirmative defenses. Furthermore, Ameri-Tel has admitted, among other things, that MCI provided service to Ameri-Tel under the terms of MCI FCC Tariff No. 1. The combination of these defects in Ameri-Tel's argument severely limit the scope of the potential dispute.

First, Ameri-Tel contends that the FCC is currently reviewing information in connection with potential rulemaking on the complicated issue of the liability of pay telephone providers for toll fraud charges. *See, e.g., Florida Public Service Commission Petition for Review of Tariff Provisions Relating to Liability for Toll Fraud Charges,* 8 F.C.C.R. 2562 (April 5, 1993); *Policies and Rules Concerning Operator Service Access and Pay Telephone Compensation,* Order on Further Reconsideration and Further Notice of Proposed Rulemaking, 8 F.C.C.R. 2863 (April 9, 1993). Ameri-Tel argues that these proceedings indicate both the complexity of the issues present here and the need for referral to the FCC to take advantage of the agency's expertise and avoid conflicting decisions.

MCI, however, correctly notes that rulemaking can only apply prospectively. *American Tel. & Tel. Co. v. FCC,* 978 F.2d 727, 732 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993); *see also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). Thus, to the extent the FCC may eventually issue rules governing the allocation of liability for toll fraud on pay telephones, those rules cannot govern that allocation in this case. On the other hand, the pending proceedings before the FCC are allowing the agency to develop a greater familiarity with the nature and scope of toll fraud than any court.

Ameri-Tel cites numerous specific cases before the FCC, one of which it notes settled before a decision, others it fails to note have been decided, and others that involve factual

and procedural settings different from that present here. Having reviewed the cases, it is apparent that although some are similar, the FCC has expressed its view that each case is decided on its individual record in light of the language of the applicable statutes and tariff provisions. As detailed below, the FCC has expressly disclaimed any effort to make broad policy statements in these cases and instead has noted that the resolution of these cases need not await completion of its pending rulemaking efforts. We find little or no potential for real conflict with FCC policy if this Court decides the issues in this case.[2]

Ameri–Tel also suggests that Illinois Bell's alleged representations that it would take care of some of the charges and subsequent alteration of bills renders its unreasonable, unfair and unjust to allow MCI now to collect for those charges. At the very least, Ameri–Tel suggests the FCC should have the opportunity to decide whether MCI's conduct is unreasonable. Even assuming that Illinois Bell acted as MCI's agent, representations made by a carrier or its agent relating to charges in contravention of the filed tariff cannot stand as a valid defense.

■ The carrier must collect the filed rate and it is a basic application of the filed rate doctrine that misquotes by the carrier or agreements contrary to the filed tariff will not absolve the customer from paying the filed rate. See *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127–28, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990). As the Court recently reiterated, "[t]he filed rate doctrine embodies the principle that a [customer] cannot avoid payment of the tariff rate by invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to a different rate." *Reiter v. Cooper*, —— U.S. ——, ——, 113 S.Ct. 1213, 1219, 122 L.Ed.2d 604 (1993). Ameri–Tel is simply seeking to estop MCI from asserting the terms of its Tariff because of its reliance on Illinois Bell's representations. That kind

of argument is foreclosed by the filed rate doctrine, despite Ameri–Tel's attempt to characterize it as an attack on the "reasonableness" of MCI's conduct.

Furthermore, the FCC has already indicated its view that a carrier's attempt to collect unauthorized charges in a PBX fraud case is not unreasonable if consistent with the terms of its tariff. In *Chartways Technologies, Inc. v. AT & T Communications*, the FCC held firmly that it was not unreasonable for AT & T to collect from its customers for unauthorized use under its tariff. FCC File No. E–88–72 (August 19, 1993). Ameri–Tel contends that, since Chartways did not allege negligence on the part of AT & T, the FCC's holding should not apply in this case, where the possibility of negligence on the part of MCI and Illinois Bell exists. *See* Ameri–Tel's Response at 17. However, Chartways explicitly alleged that AT & T had complete control over its systems and negligently failed to warn Chartways of the potential for toll fraud. *See Chartways*, 8 F.C.C.R. 5601, at ¶¶ 14–16. Furthermore, the FCC in its decision stated at the outset that AT & T's alleged negligence with regard to the disputed calls was one of three primary issues. *Id.* ¶ 16. The FCC affirmed the finding of the Common Carrier Board that Chartways had failed to provide any authority that supported imposition of a duty on carriers to warn about toll fraud and that no persuasive evidence supported a finding of negligence on AT & T's part. Thus, Ameri–Tel's attempt to distinguish *Chartways* falls on its face.

The FCC has also considered a case involving a carrier's attempt to collect charges from a payphone operator for unauthorized interstate and international calls placed from the company's payphones. In *In the Matter of United Artists Payphone Corp. v. New York Telephone Co.*, 8 F.C.C.R. 5563 (August 18, 1993), the United Artists ("UA") contended that New York Telephone and AT & T

---

**2.** We likewise dispose of Ameri–Tel's arguments regarding the long-running battle between AT & T and MCI regarding MCI's failure to file a tariff encompassing all its rates and practices. AT & T's successful challenge to MCI's practice of charging some rates *outside* its tariff is not a

challenge to the lawfulness or the application of rates found within MCI's filed tariffs. *American Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 732 (D.C.Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993).

were acting unlawfully in attempting to collect for unauthorized usage on its phones. UA raised a threshold question as to whether it was AT & T's "customer" as the tariff imposed liability for charges only on the "customer" who ordered service.[3] Because the FCC found that UA was not AT & T's customer, the FCC found that UA was not liable for the charges that AT & T sought to collect. The FCC's implicit holding is that if UA qualified as the actual or constructive customer, then the language of the tariff controls and imposes liability on the customer in the absence of an exception in the tariff.

Though it has been careful to limit its decisions to the record made in specific cases, the FCC has not held that it is an unreasonable practice for a carrier to seek recovery of unauthorized charges from a customer. In fact, its current decisions appear to indicate the opposite is true, at least under current law and regulations. Under such circumstances, referral is unnecessary. "[W]here resort to the agency would plainly be unavailing in light of its manifest opposition or because it has already evinced its 'special competence' in a manner hostile to [the party seeking referral], courts need not bow to the primary jurisdiction of the administrative body." *Bd. of Educ. of City School Dist. of City of New York v. Harris,* 622 F.2d 599, 606 (2d Cir.1979), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). While the FCC's decisions are not entirely hostile to Ameri–Tel's position, we do not believe the FCC has any greater expertise than this Court in reviewing and applying the terms of tariffs in light of the filed rate doctrine.

Another district court reached the same conclusion in *MCI Telecommunications Corp. v. Gorman, Wells, Wilder & Assoc.,* 761 F.Supp. 124, 126 (S.D.Fla.1991). Ameri–Tel cites this case as support for its view that the filed-rate doctrine is not an absolute bar to all defenses that it has raised but suggests in a footnote that we ought not follow its holding that referral is unnecessary where a Defendant challenges the application of the

filed rate doctrine in a particular case. Ameri–Tel then states that this case differs from *Gorman* because it "believes the only way in which the reasonable rate under that doctrine can be established is by reference to the FCC." Aside from Ameri–Tel's mingling of the terms "unreasonable rates" and "unreasonable practices," this Court does not consider an unsupported statement in a footnote suggesting that MCI's Tariff rates are unreasonable sufficient to warrant referral to the FCC. In accord with the *Gorman* court, we find that this case involves application of the filed rate doctrine and the terms of a tariff. Such tasks are well within the competence of this Court.

Were the case to turn on a determination of the reasonableness of MCI's Tariff rates or its practices, it is settled that referral would be appropriate since the administrative agency is best suited to make that determination. *See, e.g., Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 305, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *Western Pac. R.R. Co.,* 352 U.S. at 63, 77 S.Ct. at 164; *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 439–43, 27 S.Ct. 350, 354–56, 51 L.Ed. 553 (1907). The reasonableness of a regulated carrier's tariff is certainly an issue that could affect the entire industry; thus, the need for uniformity in the regulation of business dictates that an agency specifically empowered by Congress to undertake that regulation should make the expert determination of reasonableness. Reasonableness, however, is not the issue here.

The Court also concludes that there is no need for us to delve deep into the world of information indicators, automatic number identifiers, operator line screening, billed number screening, and all the other acronyms Ameri–Tel believes are at the heart of this case. The FCC is better suited than this Court to decide issues turning on the operation of these technical mechanisms. However, as we stated above, Ameri–Tel has overstated the nature of this case.

---

**3.** Though not raised by either party, the *United Artist* decision points to an important issue that we must resolve if MCI is to obtain summary judgment. As more fully discussed below, we must determine on the evidence presented whether there is a genuine dispute that Ameri–Tel is MCI's customer and thus liable under the tariff.

After careful consideration of the relevant factors, we conclude that the facts and issues of this case do not suggest the need for referral to the FCC. At bottom, this case involves a suit to collect $124,064.84 allegedly owed MCI under its Tariff filed with the FCC. This case is not about technical or economic issues in the telecommunications industry, as Ameri–Tel argues. It is likewise not about the reasonableness of MCI's Tariff. Rather, it is a collection case requiring application of the filed-rate doctrine and construction of the terms of the MCI Tariff. Finally, there is no danger of this Court contradicting a prior application to the FCC in this case (since none was made) or issuing a ruling inconsistent with the FCC's overall regulatory scheme. For these reasons, we find that it would be inappropriate to refer any issues in this case to the FCC under the doctrine of primary jurisdiction.

### MCI's Summary Judgment Motion [4]

As stated at the outset, we must grant summary judgment if the pleadings and supporting documents show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. This Court will not deviate from the established practice in this district of upholding Local Rules 12(M) and 12(N). Ameri–Tel did not file a response to MCI's statement of undisputed facts as required by Local Rule 12(N). In neglecting to do so, it admitted the properly supported facts contained in MCI's 12(M) statement. The question remains whether those admitted facts entitle MCI to summary judgment in its favor.

MCI correctly points out that, on June 16, 1993, this Court denied Ameri–Tel leave to amend its Answer to MCI's Second Amended Complaint. Furthermore, the Federal Rules of Civil Procedure require

Ameri–Tel to plead affirmative defenses such as estoppel [5] and illegality in a response to a preceding pleading. See Fed.R.Civ.P. 8(c). Thus, we need not consider the affirmative defenses raised for the first time in Ameri–Tel's Response. See, e.g., Computer Network Corp. v. Compmail Systems, Inc., No. 84 C 6813, slip op., 1985 WL 2218 (N.D.Ill. July 10, 1985) (failure to plead affirmative defense until responding to summary judgment motion constitutes waiver of that defense). The Seventh Circuit has treated the failure to raise affirmative defenses in a responsive pleading as a waiver of those defenses. See, e.g., Bank Leumi Le–Israel, B.M. v. Lee, 928 F.2d 232, 235 (7th Cir.1991); Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc., 649 F.2d 530, 534 (7th Cir.1981). In addition, we find that Ameri–Tel has waived any counterclaims, such as willful misconduct, by failing to file any counterclaim. We will not consider claims and defenses raised for the first time in a brief in response to a summary judgment motion.

### Call–Blocking Agreements

The record is devoid of any facts to support Ameri–Tel's claim that MCI had any agreements with Illinois Bell to block calls. It also is undisputed that Ameri–Tel never spoke to MCI about entering into any agreement to block any type of call from Ameri–Tel's payphones. Illinois Bell has admitted that Ameri–Tel subscribed to a blocking service for International Direct Distance Dialed ("IDDD") calls. That service, however, was offered by Illinois Bell as part of its tariff and no evidence indicates that MCI provided such a service or was responsible for blocking such calls. Though it is not entirely clear, it appears that the charges sought by MCI involve operator-assisted calls, not direct-dialed calls.

---

4. The Court finds no merit to Ameri–Tel's objections to the supporting material and affidavits offered by MCI.

5. We also add that Ameri–Tel apparently sought relief from the unauthorized charges by phoning Illinois Bell who then allegedly assured Ameri–Tel that it would take care of the unauthorized charges that should have been blocked. According to the MCI tariff, however, written notice is required to dispute charges. Tariff § B–7.05. There is no evidence that Ameri–Tel provided any written notice to either MCI or Illinois Bell. In the absence of such a notice, the invoice is deemed to be correct and binding on the customer.

■ Ameri–Tel alleges fraud in international operator-assisted calls made from its payphones. *See* Ameri–Tel's Response at 2. MCI also points out that the alleged fraud came from operator-assisted calls. Thus, even if Illinois Bell was supposed to block IDDD calls, this does not cover the calls for which MCI seeks payment from Ameri–Tel. If MCI does seek payment for IDDD calls, then Illinois Bell acknowledges those calls should have been blocked. Nonetheless, pursuant to its Tariff, MCI is entitled to recover since it is not bound by Illinois Bell's tariff. Illinois Bell's liability to Ameri–Tel is the subject of a claim filed by Ameri–Tel that is not the subject of this motion.

*MCI's Tariff and the Filed Rate Doctrine*

Ameri–Tel admits that MCI Tariff F.C.C. No. 1 governs the liabilities of the parties. As noted above, the filed rate doctrine governs MCI's right to collect from Ameri–Tel for the unpaid service under the Tariff. Recently, this same Tariff was deemed controlling in another case heard in this district where the non-movant failed to file a 12(N) statement in response to MCI's motion for summary judgment. *MCI Telecommunications, Inc. v. Premium Mktg. Sys.*, No. 91 C 4048, 1992 WL 6693, at *1–2, 1992 U.S. Dist. LEXIS 304, at *4 (N.D.Ill. Jan. 15, 1992). We find no reason to consider this same critical failure by Ameri–Tel any differently.

■ The Supreme Court has upheld the filed rate doctrine [6] as a bar to all equitable defenses against liability for charges incurred under properly filed tariffs. Such defenses include the estoppel and illegality defenses raised by Ameri–Tel in this case. *See, e.g., Reiter v. Cooper*, —— U.S. ——, ——, 113 S.Ct. 1213, 1219, 122 L.Ed.2d 604 (1993); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 120–21, 110 S.Ct. 2759, 2762–63, 111 L.Ed.2d 94 (1990); *Southern Pac. Transp. Co. v. Commercial Metals, Inc.*, 456 U.S. 336, 352, 102 S.Ct. 1815, 1825, 72 L.Ed.2d 114 (1982). The Sev-

enth Circuit has also upheld the filed rate doctrine as a strict bar to equitable defenses. *See, e.g., Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227, 1229 (7th Cir.1982). The filed rate doctrine is contained in the very language of the Act: "[n]o carrier shall ... collect, or receive ... less or different compensation ... than the charges specified in the schedule." 47 U.S.C. § 203(c).

We first will set out the relevant Tariff language and then will examine the language of the Tariff in light of the filed rate doctrine. MCI's Tariff, F.C.C. No. 1, specifies that:

> The customer is responsible for payment of all charges for services furnished to the customer or its joint or authorized users. This responsibility is not changed by virtue of any use, misuse, or abuse of the customer's service, which use, misuse, or abuse may be occasioned by third parties, including without limitation, the customer's employees or other members of the public.

Tariff § B–7.01. The Tariff, § A, defines "customer," in pertinent part, as follows:

> The person, firm, corporation or other entity which orders service ... and which is responsible for the payment of charges and for compliance with MCI tariff regulations.

The Tariff, § A, defines "authorized user" as "[a] person, firm, corporation, or other entity that either is authorized by the customer to receive or send communications or is placed in a position by the customer to send or receive communications."

As we noted above, the FCC's decision in *In the Matter of United Artists Payphone Corp. v. New York Telephone Co.*, 8 F.C.C.R. 5563 (August 18, 1993), requires that we analyze whether Ameri–Tel qualifies as MCI's customer according to the language of the Tariff and the record in this case. In *United Artists*, the FCC found that a payphone operator cannot be held to be the customer for operator-assisted calls under ordinary circumstances. The FCC still reasoned, however, that "[i]f [a payphone opera-

---

6. The filed rate doctrine "forbids a regulated entity from charging rates for its services other those properly filed with the appropriate federal regulatory agency." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require. *Id.* at 577–78, 101 S.Ct. at 2930.

tor] had failed to take steps to control unauthorized operator-assisted and direct-dialed calling and had, instead, installed its phones in such a way as to allow callers to charge such calls to [its] payphone lines, [the payphone operator] could reasonably be held to have constructively 'ordered' service from [the carrier], thus establishing an inadvertent carrier-customer relationship." *Id.* at ¶ 13. Thus, we will examine the steps taken by Ameri–Tel in this case to prevent unauthorized usage.

■ The similarities between this case and *United Artists* are few. Ameri–Tel did order IDDD blocking from Illinois Bell. Ameri–Tel did contact Illinois Bell about alleged fraud. Unlike UA, there is no evidence before the Court that Ameri–Tel declined to presubscribe its phones or purchased screening for operator-assisted calls, or purchased originating line or billed number screening. The only evidence indicates it had contracted with MCI for service on the accounts in question. In further contrast, UA had programmed its phones to block operator-assisted and direct-dialed calling outside of the local area. No evidence shows that Ameri–Tel took this precaution. Under these circumstances, we do not find any genuine dispute that Ameri–Tel constructively ordered service from MCI for the fraudulent or unauthorized charges at issue here. We find that Ameri–Tel was MCI's customer.

Our conclusion is fully consistent with the Tariff language which extends the liability of a customer to cover abuse or misuse by third parties. Moreover, the customer is also responsible for charges incurred by "authorized users" including those put in a position by the customer to send communications. When a payphone operator fails to take adequate available steps to prevent fraud, one can conclude that the operator/customer has placed even those intending to defraud the company in a position to send communications.

The pending FCC rulemaking proceedings may indeed alter the liabilities of carrier and customer for toll fraud, but until that time, the clear language of a filed tariff will control. MCI's Tariff places responsibility for the charges at issue on Ameri–Tel. This Court will not rewrite the Tariff to alter that result.

### Amount Owed to MCI

Finally, there is no issue as to the amount of money owed MCI under the Tariff. MCI's 12(M) statement clearly sets forth the amount in controversy at $128,923.84. MCI's 12(M) Statement at para. 5. MCI subsequently agreed to drop its claim for the six accounts Ameri–Tel insists do not cover telephones with MCI long-distance service, leaving the final amount due MCI at $124,064.84, plus reasonable attorneys' fees and costs as provided for in the Tariff.[7]

Ameri–Tel failed to file a 12(N) statement disputing this or any amount owed MCI in this case. Its pleadings merely reflect a lack of knowledge as to how MCI arrived at its figures. We do not consider the arguments or affidavits tendered by Ameri–Tel in an attempt to create an issue as to the amounts owed to MCI. MCI is thus entitled to collect $124,064.84 under the terms of its Tariff.

### CONCLUSION

For the foregoing reasons, we grant MCI's motion for summary judgment and award MCI $124,064.84, plus attorneys' fees and costs, as required by the Tariff.

7. Section B–7.09 of the Tariff provides that "In the event the Company incurs fees or expenses, including attorney's fees, in collecting, or attempting to collect, any charges owed the Company, the customer will be liable to the Company for the payment of all such fees and expenses reasonably incurred."