**AMERICAN TELEPHONE
& TELEGRAPH CO.,
Plaintiff,**

v.

**IMR CAPITAL CORP., Defendant
and Third–Party Plaintiff,**

v.

**NEW ENGLAND TELEPHONE AND
TELEGRAPH COMPANY, Third–
Party Defendant.**

**IMR CAPITAL CORP., Plaintiff,**

v.

**AMERICAN TELEPHONE
& TELEGRAPH CO.,
Defendant.**

**Civ. A. Nos. 90–12866–NG, 92–10919–NG.**

United States District Court,
D. Massachusetts.

May 10, 1995.

Lawrence G. Green, James A.G. Hamilton, Perkins, Smith & Cohen, Boston, MA, for American Tel. & Tel. Co.

Douglass W. Stoddart, Goodman, Goguen & McLaughlin, P.C., South Natick, MA, Paul C. Besozzi, Besozzi & Gavin, Washington, DC, Lawrence G. Green, Perkins, Smith & Cohen, Boston, MA, for IMR Capital Corp.

Thomas A. Barnico, Atty. General's Office, Boston, MA, for Massachusetts Dept. of Public Utilities.

William J. McDonald, Boston, MA, for New England Tel.

### MEMORANDUM AND DECISION

GERTNER, District Judge.

## I. INTRODUCTION

This is yet another chapter in the multivolume saga of litigation which has arisen out of the break-up of the Bell System and the deregulation of the telephone industry. The subject of this episode is "Consumer Owned Coin Operated Telephones," better known in the industry as "COCOTs." A COCOT is a type of coin-operated pay telephone. Unlike most pay telephones, which are owned by the Local Exchange Carrier ("LEC"),[1] COCOTs are owned by third parties, which must gain access to the telephone grid through the LEC. Because LECs also own pay telephones, they function both as suppliers and competitors of COCOT owners. It is this inherent conflict of interest and, in particular, the potential for unfair monopolistic practices, which forms the core of this case.

## II. FACTS

### A. The Parties

Two of the actors in this saga need little introduction. American Telephone & Telegraph Co. ("ATT") is the largest provider of long-distance telephone service in the United States and formerly held a monopoly on all telephone services in most areas of the country. ATT also owns and operates a small number of pay telephones in Massachusetts. New England Telephone ("NET") was formerly a subsidiary of ATT and now, as a subsidiary of Nynex Corporation, serves as the LEC for virtually all telephone customers in Massachusetts. NET also owns and operates the vast majority of pay telephones in Massachusetts.

Less well known is IMR Capital Corporation ("IMR"). IMR is, and has been since 1987, the owner of several hundred COCOTs throughout Massachusetts. Through these COCOTs, IMR resells local and long-distance telephone service to its customers. IMR, in turn, purchases access to the telephone grid from NET, and, prior to the filing of these actions, subscribed to long-distance service from ATT. In 1990, having become dissatisfied with ATT's service, IMR entered into agreements with other long-distance carriers, including MCI, which now provide long distance service to its COCOTs.[2] IMR claims

---

1. LECs are the entities which provide telephone service within a local calling region, and which provide most telephone customers with their physical connection to the telephone network.

2. A customer wishing to make a long distance telephone call from a payphone always has the option of selecting a long distance carrier by dialing a 10XXX access code (or an 800 number). Only if the customer fails to do this does the long distance carrier selected by the COCOT owner provide the service.

that it switched to MCI because MCI agreed to provide it with the terms of service which ATT had refused to provide.

## B. *The Problem With COCOTs*

Although similar in appearance to NET-owned pay telephones, COCOTs are, according to the amended third-party complaint, fundamentally different devices. NET's pay telephones are connected to NET's central switching office through special dedicated "coin lines." Through these coin lines, the NET phones are able to transmit payment information (i.e. information about the insertion of coins into the phone) from the phone to the central switching office, and NET is able to transmit commands (to return or keep deposited coins) back to the phones. As a result, NET is able to control access to these phones from its switching office, and to prevent the completion of calls unless proper payment has been made.

By contrast, COCOTs are connected to NET's switching offices via ordinary business phone lines. Calls made from a COCOT are ordinarily billed to its owner, just as any other business customer would be billed. Because business lines do not have the ability to transmit control or payment information between the telephone and NET's central office, the COCOTs attached to them must be "smart" enough to perform all required functions on their own, without any external control. Thus, in order for IMR to make a profit from its operation of COCOTs, its COCOTs' internal circuits must insure that the user of the phone has deposited an amount of money in excess of the anticipated cost (to IMR) of the call.

According to IMR, NET refuses to permit the connection of COCOTs to NET's dedicated coin lines. The resulting disadvantage to COCOT owners is twofold. First, COCOTs are simply more expensive than conventional pay telephones, as they must contain, in addition to all of the features of an ordinary pay telephone, sophisticated circuitry for performing all of the "gatekeeping" functions which NET performs at its central office. As a result, COCOT owners must spend more on pay telephone equipment than NET in order to provide the same level of service.

Second, and perhaps more significantly, COCOTs are susceptible to certain types of fraudulent calling to which NET's coin line phones are immune. The principal type of COCOT fraud by which IMR claims to be victimized entails access to "secondary dial tones." Because COCOTs are connected to the telephone network through "dumb" business phone lines (i.e. lines without special "coin line" circuitry), the dial tone on these lines is "open." The COCOT controls access to the line by generating its own dial tone, and storing the number dialed by a customer in its memory. After checking to see if sufficient funds have been deposited, the COCOT retransmits the stored number to the telephone switching office, and the call is completed.

Secondary dial tone fraud occurs by taking advantage of a particular weakness in this system. Once the COCOT has retransmitted the dialed number to NET's central switching office, it must open a direct connection to the switching office so that the customer's conversation can be transmitted. In the ordinary course, this direct connection is terminated when the customer finishes speaking and hangs up. However if a call made from a COCOT is terminated by the receiving party, but the caller does not hang up, the central switching office will detect the termination of the call and, after a time, automatically generate a new dial tone for the COCOT. If the COCOT customer fails to hang up after the termination of the call, he will eventually gain access to a central office generated dial tone, which can be used to make new calls which the COCOT is unable to screen.

In a typical fraud described by IMR, a customer dials the operator from a COCOT. Because there is no charge for dialing the operator, the COCOT puts the call through without requiring the deposit of any coins. The customer then says nothing and the operator eventually hangs up, thus prompting the generation of a new dial tone, from which the customer can make unlimited calls without paying for them. The charges for these calls, however, still get billed to the COCOT owner.

### C. *IMR's Disputes With NET and ATT*

IMR alleges that it has taken all practical steps to prevent fraudulent calls from being made on it COCOTs. One such step was to reprogram its COCOTs to disable the push-buttons after a certain number of seconds off-hook. While this change made it harder to engage in secondary dial tone fraud, it also limited the utility of the COCOTs by preventing customers from accessing voice mail, answering machines, pagers and similar services which require the pushbuttons to operate after the call has been put through.

IMR also alleges that it has subscribed to all call screening and blocking services available from NET. These services include "billed-number screening," which prevents operator assisted long distance calls from being billed to the subscriber's number through third-party billing,[3] and "originating-line screening," which prevents operator assisted calls from being billed to the originating telephone line. IMR alleges that NET has failed to properly implement these services. IMR has also asked both NET and ATT to block certain types of calls (such as international calls) from being made from its phones entirely. IMR alleges that both NET and ATT have the ability to block such calls, but have refused to do so. Thus, IMR alleges that, despite its best efforts, fraudulent calling from its COCOTs continues.

IMR contends that NET's failure to provide IMR with access to "coin lines" and NET and ATT's failure to provide necessary call blocking services are all part of a larger scheme by NET to monopolize the pay telephone market in Massachusetts and by ATT to monopolize long distance service from pay telephones in Massachusetts. IMR claims that, in addition to the above, NET has engaged in anti-competitive practices by predatory pricing of its commissions to location owners,[4] by making misleading comments about the quality of IMR's service, by charging COCOT owners rates in excess of the effective rate which it charges itself for pay telephone lines, by improperly installing the local exchange access lines upon which IMR's COCOTs depend, by billing IMR for calls never made, by failing to timely respond to service calls, and by engaging in discriminatory practices against COCOT owners with respect to billing, deposit requirements, payment dates, and the like.

IMR also alleges that NET and ATT conspired to eliminate IMR from the pay telephone market in Massachusetts. According to IMR, this conspiracy involved both NET and ATT refusing to provide necessary call blocking services to IMR and to properly implement the ones they did provide, thus interfering with IMR's ability to prevent secondary dial tone fraud.

## III. THE ACTIONS

### A. ATT v. IMR (90–12866)

On November 27, 1990, ATT brought suit (C.A. No. 90–12866) against IMR, seeking to collect in excess of $200,000 in unpaid long-distance telephone charges. IMR answered that the telephone charges were the result of calls fraudulently made from its COCOTs and denied that it was liable for the charges.

### B. *IMR v. NET (Third Party Complaint, 90–12866)*

On November 13, 1991, IMR filed a third-party complaint (subsequently amended) against NET.

Counts I and II of the amended third-party complaint allege that NET engaged in a conspiracy with ATT to prevent IMR from competing in the pay telephone market in Massachusetts, in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and Section 4 of the Massachusetts Antitrust Act (M.G.L. ch. 93 § 4).

Counts III through VI allege that NET has monopolized or attempted to monopolize the pay telephone market in Massachusetts, in violation Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 5 of the Massachusetts Act (M.G.L. ch. 93 § 5).

---

3. That is, calls made from other numbers cannot, at the request of the caller, be billed to a number having "billed-number screening."

4. Many pay telephones are located on private property, the owners of which receive a commission in return for allowing the phones to be placed on that property.

Counts VII and IX allege that NET's COCOT access policy is unreasonable and unjust, in violation of Section 201(b) of the Communications Act of 1934 (47 U.S.C. § 201(b)) and Sections 1, 13 and 17 Massachusetts Public Utility Code (M.G.L. ch. 159 §§ 1, 13, 17), while Count VIII alleges that it is unreasonably discriminatory, in violation of Section 202(a) of the Communications Act (47 U.S.C. § 202(a)).

Additional counts include a claim for tortious interference with contract (Count X), and "violation of a duty of due care" (Count XI) and a claim for a declaratory judgment that IMR is not liable for fraudulent telephone calls made from its COCOTs (Count XII).

### C. IMR v. ATT (92–10919)

On April 1, 1992, IMR filed a second action (C.A. No. 92–10919) against ATT. The factual allegations in the complaint largely mirror those in No. 90–12866, alleging in essence that ATT refused to provide call blocking services to IMR, and that, as part of a conspiracy with NET, it refused to cooperate with NET to implement call blocking methods requested by IMR. As in No. 90–12866, the complaint alleges various state and federal antitrust counts, violations of federal and state communications law, unfair competition, tortious interference with contractual relationships and breach of duty. It also seeks a declaration that IMR is not liable to ATT for calls fraudulently made from its COCOTs.

## IV. THE PROCEEDINGS SO FAR

On February 4, 1992, NET filed a motion to dismiss the amended third-party complaint in No. 90–12866.

On April 28, 1992, ATT filed a motion for summary judgment on its claim for unpaid telephone bills in No. 90–12866. On May 12, 1992, IMR moved, pursuant to Fed.R.Civ.P. 56(f), to postpone consideration of ATT's summary judgment motion in No. 90–12866 in order to permit time for further discovery.

On June 3, 1992, ATT filed a motion to dismiss the complaint in No. 92–10919.

On June 30, 1992, Judge Woodlock of this Court heard oral argument on NET's motion to dismiss. Subsequently, the Court requested an Amicus Curiae submission from the Massachusetts Department of Public Utilities ("DPU"). DPU submitted a memorandum on September 17, 1992. On May 16, 1994, both cases were reassigned to me and, on October 7, 1994, oral argument was heard on all four outstanding motions: NET's and ATT's motion to dismiss the 1990 third party complaint (No. 90–12866) and the 1992 action (No. 92–10919) respectively; ATT's motion for summary judgment on its claim for unpaid telephone bills; and IMR's motions to postpone the former, pursuant to Fed. R.Civ.P. 56(f), pending further discovery.

## V. ANALYSIS

### A. NET's Motion to Dismiss

■■■ NET has moved to dismiss all of the counts against it. In considering a motion to dismiss the Court begins "by accepting all well-pleaded facts as true, and ... draw[ing] all reasonable inferences in favor of the [nonmovant]." Washington Legal Foundation v. Massachusetts Bar Foundation, 993 F.2d 962, 971 (1st Cir.1993). The complaint will be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). In analyzing the sufficiency of the complaint, the court may consider official public records, the authenticity of which are not in dispute. Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993). For the following reasons, NET's motion is **AL-LOWED IN PART AND DENIED IN PART.**

In Part 1 of this subsection, I address NET's argument that IMR's federal antitrust claims are barred by the "state action doctrine." In Part 2, I address similar issues relating to IMR's claims under Massachusetts antitrust law. Part 3 deals with NET's contention that IMR's claims under the Communications Act of 1934 are barred by the doctrine of primary jurisdiction. Part 4 addresses NET's argument that IMR's claims under the Massachusetts Common Carrier Law fail to state a cause of action. Part 5

discusses IMR's claims under Massachusetts common law. Finally, Part 6 deals with IMR's request for a declaratory judgment.

### 1. *The Federal Antitrust Counts (I, III and IV)*

#### a. *The State Action Doctrine*

NET contends that all of the federal antitrust counts against it (Counts I, III and IV) should be dismissed under the so-called "state action doctrine." This court-made doctrine is grounded in principles of federalism, and immunizes state regulatory programs from federal antitrust attack. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 103, 100 S.Ct. 937, 942, 63 L.Ed.2d 233 (1980); *Federal Trade Commission v. Ticor Title Insurance Co.*, 504 U.S. 621, 631–637, 112 S.Ct. 2169, 2176–2178, 119 L.Ed.2d 410 (1992). This immunity extends both to the regulatory activities of the states themselves (*see Parker v. Brown*, 317 U.S. 341, 350–352, 63 S.Ct. 307, 313–314, 87 L.Ed. 315 (1943)) and to the practices of private parties acting pursuant to state policy. *Patrick v. Burget*, 486 U.S. 94, 99–100, 108 S.Ct. 1658, 1662–1663, 100 L.Ed.2d 83 (1988).

State action immunity is, however, a limited doctrine which, like repeals by implication, is disfavored. *Ticor*, 504 U.S. at 635–637, 112 S.Ct. at 2178. In applying the doctrine, this Court must be cognizant of the doctrine's purpose, the avoidance of interference with state regulation, and must insure that the scope of its application is narrowly tailored to achieve that goal. In particular, the doctrine must not be turned into a means by which states can "confer antitrust immunity on private persons by fiat." 504 U.S. at 633, 112 S.Ct. at 2176.

In *Midcal*, the United States Supreme Court articulated two standards which must be satisfied before state action antitrust immunity may be claimed. "First, the challenged restraint must be one clearly articulated and affirmatively expressed as State policy; second, the policy must be actively supervised by the State itself." 445 U.S. at 105, 100 S.Ct. at 943. *See also Ticor*, 504 U.S. at 633, 112 S.Ct. at 2176; *Patrick*, 486 U.S. at 100, 108 S.Ct. at 1662–1663 (describing *Midcal* standards as "rigorous"). These two standards are closely related, and both are intended to insure that the details of the challenged policy are the "product of deliberate state intervention," for which the state must take political responsibility. *Ticor*, 504 U.S. at 634–635, 112 S.Ct. at 2177–2178.

The first element of the *Midcal* test, the existence of a "clearly articulated and affirmatively expressed state policy," may be satisfied in one of two ways. First, the state legislature may specifically authorize or mandate the challenged activity. *See Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 63, 105 S.Ct. 1721, 1730, 85 L.Ed.2d 36 (1985). Alternatively, the state legislature may create a regulatory agency, and provide it with the authority and discretion to implement broad state policy in its particulars. *Id.* at 63–64, 105 S.Ct. at 1730. In such a case, it is appropriate to look to the agency as a source of state regulatory policy. *Id.*

The second *Midcal* element, relating to "active" state supervision, insures that the state implement the challenged policy "in its specific details." *Ticor*, 504 U.S. at 633, 112 S.Ct. at 2176. Under this test, a state cannot merely create a space for private parties to further their own interests by operating in an anti-competitive fashion. *Patrick*, 486 U.S. at 100, 108 S.Ct. at 1662–1663. Rather, if a state believes that anti-competitive behavior is in the public interest, it must exercise its own "independent judgment and control" so that the specific activities taken under the policy are actually dictated by the state. *Ticor*, 504 U.S. at 634, 112 S.Ct. at 2177.

#### b. *Massachusetts' Regulation of NET*

NET accurately contends that its business of providing telephone service in Massachusetts is pervasively regulated by the DPU. Pursuant to authority granted by M.G.L. ch. 159, the DPU exercises "general supervision and regulation of, and jurisdiction and control over ... [t]he transmission of intelligence within the commonwealth by electricity, by means of telephone lines or telegraph lines or any other method or system of com-

munication, including the operation of all conveniences, appliances, instrumentalities, or equipment appertaining thereto, or utilized in connection therewith." M.G.L. ch. 159 § 12.

The DPU is generally empowered to regulate both the "rates, fares or charges" and the "regulations, practices, equipment, appliances or service" of any common carrier operating within the Commonwealth. M.G.L. ch. 159 §§ 14, 16. Although rates are set initially by the regulated carriers, they are subject to pre-approval by the DPU, which may delay their implementation pending public hearing and investigation. M.G.L. c. 159 § 19.

Not only does the DPU have the power to regulate NET, but it appears to exercise that power vigilantly. NET's proposed tariff changes are regularly scrutinized by the DPU in public hearings in which numerous concerned private parties, as well as the Attorney General of the Commonwealth, participate. The DPU has frequently modified these tariffs when they are not found to be in the public interest. *See, e.g. New England Telephone and Telegraph Co.*, DPU 86–124D, 1986 WL 213483 (1986) (modifying tariff filed by NET); *New England Telephone and Telegraph Co.*, DPU 89–300, 1990 WL 488888 (1990) (same); *New England Telephone and Telegraph Co.*, DPU 91–30, 1991 WL 501660 (1991) (same); *New England Telephone and Telegraph Co.*, DPU 92–100, 1992 WL 421265 (1992) (same). Moreover, the DPU conducts investigations of the telephone industry on its own initiative to determine whether existing levels of service and rate structures are in the public interest. *See, e.g. Investigation of Pay Telephone Service*, DPU 89–20 (1991) (investigating allegations regarding NET's treatment of COCOT owners).

### c. Has Massachusetts Clearly Articulated a Policy?

Although NET is heavily regulated by the DPU, this fact alone does not mean that Massachusetts has a policy which is inconsistent with the enforcement of federal antitrust laws. *Ticor*, 504 U.S. at 635–637, 112 S.Ct. at 2178. *See also Hardy v. City Optical, Inc.*, 39 F.3d 765, 768 (7th Cir.1994) (state may have a regulatory program "that can coexist happily with the full enforcement of

federal antitrust principles because the program does not require the supplanting of competition"). As the Supreme Court has noted, "public utility regulation typically assumes that the private firm is a natural monopoly and that public controls are necessary to protect the consumer from exploitation." *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 595–596, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976). Thus, "there is no logical inconsistency between requiring [a public utility] to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." *Id.*

When a state regulates a public utility, it is not the state's policy to prevent competition. Rather, the state, recognizing the inevitability of a monopoly, regulates the monopolist to prevent the kind of harms which result from lack of competition. There is, therefore, nothing about the mere fact that a public utility is regulated by a state to suggest that the state has a policy of encouraging any particular anti-competitive practices by the utility, or of discouraging competition at all, as required by the first element of the *Midcal* test.

I have carefully examined the DPU regulatory record and the allegations contained in the amended third party complaint, and conclude that at least some of the practices alleged by IMR are not in any way sanctioned by state policy. Accordingly, I am unable to grant NET's motion to dismiss IMR's antitrust claims.

Massachusetts' policy with respect to regulation of the telecommunications market is found in M.G.L. ch. 159, and the policies which the DPU has issued pursuant thereto. *See Southern Motor Carriers*, 471 U.S. at 64, 105 S.Ct. at 1730 (details of state's policy may be left to a state agency). Although Chapter 159 contains no explicit statement, Massachusetts' legislative policy can be inferred from the mandate given to the DPU. Under Section 14 of Chapter 159, the DPU is empowered to investigate whether any of the rates of a common carrier are "unjust, unreasonable, unjustly discriminatory, [or] unduly

preferential...." Under Section 16, the DPU may proscribe any "regulations, practices, equipment, appliances or service" of a common carrier which it finds to be "unjust, unreasonable, unsafe, improper or inadequate." Under both sections, the DPU may issue orders mandating rates, policies or services which satisfy the normative requirements of the statute.

The DPU's specific policy with respect to NET's provision of service to COCOTs has its genesis in the aftermath of the Modified Final Judgment in *United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982) *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The Modified Final Judgment mandated the break-up of the old Bell Telephone System, and the introduction of competition into the long distance telephone market. Under its terms, the former service area of the Bell System was divided into small regions designated as Local Access and Transport Areas ("LATAs").[5] The former Bell Operating Companies ("BOCs"), such as defendant NET, were prohibited from providing telephone service between LATAs. Such inter-LATA service was to be provided by ATT and its new competitors, such as MCI and Sprint. *United States v. Western Elec. Co., Inc.,* 569 F.Supp. 990, 993–994 (D.D.C.1993).

Although the Modified Final Judgment was intended to develop a competitive environment for interstate telephone service, the appropriate level of intrastate and intra-LATA competition was left to the determination of state regulatory agencies. *U.S. v. Western Electric Co., Inc.,* 569 F.Supp. at 1005. The DPU quickly approved inter-LATA competition within Massachusetts.[6] Its position with respect to intra-LATA competition was, however, somewhat more cautious.

In an order dated October 18, 1985, the DPU issued its initial determination concerning intra-LATA competition. *See Intra–LATA Competition,* DPU 1731 (1985). The DPU carefully considered all of the economic and social concerns surrounding intra-LATA competition, and in particular, the sometimes competing concerns of economic efficiency and universal service. DPU 1731 at 19–23. The DPU rejected suggestions that intra-LATA competition would undermine its goal of universal service and declared that competition would be introduced into the intra-LATA market on December 1, 1986. DPU 1731 at 42–44.

Although the DPU was determined to introduce competition into the intra-LATA market, this competition was not to be completely unregulated. In particular, the DPU found that NET and ATT were "dominant carriers" within the intra-LATA market in Massachusetts, thus requiring a high degree of pricing regulation which would not be imposed on other, non-dominant, carriers. DPU 1731 at 65–70. As dominant carriers, NET and ATT were required to support all proposed pricing policies with incremental cost studies and the like, while non-dominant carriers were permitted to price their services essentially as the market permitted, with only minimal documentation or scrutiny by the DPU. *Id.*

As part of its October 18, 1985 deregulation order, the DPU determined that so-called "resale" of telecommunications services should be permitted in the intra-LATA market.[7] DPU 1731 at 77–84. Accordingly, on May 1, 1986, NET filed proposed tariff revisions eliminating restrictions on the resale of its services and introducing for the first time "Public Access Line" ("PAL") service, by which COCOTs could be connected

---

5. In Massachusetts, two such LATAs were designated, corresponding to the eastern and western portions of the Commonwealth.

6. *See, e.g. MCI,* DPU 1655/84–124 (1984); *GTE Sprint,* DPU 84–12/84–157 (1984); *Satellite Business Systems,* DPU 84–125/84–148 (1984); *Western Union,* DPU 84–24/84–119 (1984); *TDX,* DPU 84–231/84–243 (1985).

7. The Federal Communications Commission defines resale "to be an activity wherein one entity subscribes to the communications services and facilities of another entity and then re-offers communications services to the public ... for profit." *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* 60 F.C.C.2d 261, 271 (1976).

to the telephone network.[8] *See New England Telephone and Telegraph Co.*, DPU 86–124–D at 2, 1986 WL 213483 (1986).

On November 26, 1986, DPU issued a decision and order based on its review of NET's proposed tariff revisions. *See New England Telephone and Telegraph Co.*, DPU 86–124–D, 1986 WL 213483. The DPU approved NET's proposal to offer PALs using a billing scheme similar to other types of business phones. DPU 86–124–D at 20. Under this plan, COCOTs would subscribe to local exchange service from NET, just as would any business customer. Calls made from COCOTs would be billed to the COCOT owner at the generally applicable business rate, and the COCOT owner was to be responsible for billing its own customers in whatever fashion it deemed feasible. With respect to "non sent paid calls" (i.e. calls made without coins, such as credit card or collect calls), the COCOT owner would be free to negotiate commission agreements with long distance carriers as it saw fit. DPU 86–124–D at 21.

On December 1, 1989, NET filed proposed tariff revisions relating to PAL service for COCOTs, which contained some modification in the rate structure of its earlier tariff, including a rebate plan for operator assisted calls, but largely kept in place the PAL–as–Business–Line arrangement. The DPU held hearings at which numerous COCOT owners intervened. *See New England Telephone and Telegraph Co.*, DPU 89–300, 1990 WL 488888 (1990).

The COCOT owners objected to the proposed tariff revisions, arguing that they should receive rates and treatment equivalent to that which NET provides to its own pay-telephone division, and contended that the proposed rate structure was unfair, as it resulted in an internal subsidy of NET's pay telephone service. On June 29, 1990, the DPU issued a decision and order. *See New England Telephone and Telegraph Co.*, DPU 89–300, 1990 WL 488888. The DPU largely accepted NET's position, rejected the COCOT owners' call for equivalent treatment, and approved, with some modification,

NET's proposed tariff revisions. In making this determination, the DPU acknowledged that it was balancing conflicting goals involved in rate-setting, which included: Aligning rates with marginal costs, simplicity, continuity, universal service, fairness, and earnings stability. DPU 89–300 at 271–275 & n. 123.

The DPU has also responded directly to complaints by COCOT owners concerning many of the service issues raised in this action. On February 19, 1991, the DPU issued a report on an investigation it had conducted concerning various issues related to pay telephone service in Massachusetts, including COCOT service. *See Investigation of Pay Telephone Service*, DPU 89–20 (1991). Within the scope of the DPU's investigation were allegations by COCOT owners of anti-competitive practices by NET, including alleged inferior customer service provided to COCOT owners and NET's alleged failure to properly block the completion of operator-assisted calls, third-party calls, and collect calls from pay telephones where it had been requested to do so by COCOT owners. The DPU concluded that there was a factual basis to these allegations, and ordered NET to take remedial measures and to report back to the DPU concerning future service problems. DPU 89–20 at pp. 32–45.

The most recent DPU review of NET's COCOT policies, to which the Court has been referred, was completed on October 28, 1992. *See New England Telephone*, DPU 92–100, 1992 WL 421265 (1992). In the context of a proposed tariff revision, the DPU once again considered complaints by COCOT owners, including IMR, concerning NET's rate structure and the quality of service which it provided on PAL lines. The DPU rejected IMR's challenge to NET's rate structure, finding that it had failed to demonstrate that the rate structure was inconsistent with the DPU's policy goals. DPU 92–100 at pp. 50–55. With respect to IMR's complaints concerning service problems, the DPU refused to order any particular remedy, but did require that NET meet with interested parties

---

**8.** COCOT operators are resellers since they buy phone service from NET and resell it to individu-al customers who use their phones.

in informal "technical conferences", to be held quarterly under the DPU's auspices, where quality-of-service issues would be discussed. DPU 92–100 at pp. 72–79.

### d. *Are the Complained of Actions the Product of Massachusetts' Articulated Policy?*

 In determining whether the state action doctrine applies, I must determine:

> Whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is not how well state regulation works but whether the anti-competitive scheme is the State's own.

*Ticor,* 504 U.S. at 634–635, 112 S.Ct. at 2177.

Applying this test to the allegations against NET, it is apparent to me that most of actions complained of are not the product of state policy and, in some instances, are contrary to it. Only in the case of DPU approved price structures do I find that the state action doctrine bars an antitrust cause of action.

### (1) *Discrimination and Poor Service*

 The most significant category of IMR's claims is that relating to NET's alleged discrimination in its provision of service to COCOT owners. Among IMR's charges are that NET refuses to offer COCOT owners the same type of "coin line" service which it uses for its own pay telephones, that it refuses to provide adequate call blocking services and other security measures necessary for COCOT owners to prevent fraudulent calls, and that it fails to timely or adequately respond to service calls from COCOT owners.

None of these allegations, if true, would further any policy articulated by the Commonwealth of Massachusetts. Indeed, they are contrary to Massachusetts' policies of promoting competition and of insuring reliable and high quality telephone service to all customers within the Commonwealth.[9] Because NET is classified as a dominant carrier by DPU, NET's rates and minimum services levels are mandated by DPU policy. But nothing in this policy prohibits NET from introducing new services or higher quality services for which there is a demand. There is, accordingly, no way in which these policies could be considered "the State's own", *Ticor,* 504 U.S. at 635, 112 S.Ct. at 2177, and therefore no reason for this Court to decline to scrutinize these allegations under the antitrust laws.

NET attempts to overcome this seemingly obvious conclusion by stressing the DPU's broad authority to regulate NET's activities (including the ones complained of here), and by noting that the DPU has, on occasion, considered complaints on these matters, and has failed to act. From these facts NET apparently concludes that none of its activities which are subject to DPU regulation can ever violate federal antitrust law, since they are being "actively supervised" by the DPU. This argument fundamentally misapprehends the nature of the state action doctrine.

 As explained above, states may not simply "confer antitrust immunity on private persons by fiat." *Ticor,* 504 U.S. at 633, 112 S.Ct. at 2176. The immunity arises only where the state has specifically intended to "displace competition in a particular field with a regulatory structure." *Southern Motor Carriers,* 471 U.S. at 64, 105 S.Ct. at 1730. And even where the state regulates one aspect of a firm's activities through non-market mechanisms—here pricing—all of its remaining activities continue to be subject to antitrust scrutiny. *See Cantor v. Detroit*

---

9. While it is true that the DPU has approved a tariff which requires NET to provide a PAL line (rather than a coin line) to COCOT owners, this is not evidence of a DPU policy against providing a higher level of service to COCOT owners if, in fact, it is feasible. I find nothing in the DPU administrative record to suggest that the DPU ever seriously considered the question of permitting or requiring NET to offer coin-line service to COCOT owners. In the absence of such a determination by DPU, I cannot conclude that NET is merely following DPU policy by refusing to offer such a service.

*Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).

■ What NET's argument fails to acknowledge is that it is not the purpose of all "regulatory structures" to displace competition. *See Capital Telephone Co. v. New York Telephone Co.* 750 F.2d 1154, 1160 (2d Cir. 1984) *cert. den.* 471 U.S. 1101, 105 S.Ct. 2325, 85 L.Ed.2d 843 (1985); *Hardy,* 39 F.3d at 768. Virtually every industry in the United States is regulated to some degree. Yet we still live in a market economy in which the antitrust laws remain in full force. *See Ticor,* 504 U.S. at 635–637, 112 S.Ct. at 2178. A distinction must therefore be drawn between that type of regulatory scheme which is inherently anti-competitive and that type of regulation which merely restrains the exercise of market power. *Id.* Only in the former case would the application of antitrust law interfere with the legitimate regulatory power of the state. *See Midcal,* 445 U.S. at 104, 100 S.Ct. at 942–943.

NET cites to cases upholding state-approved, private rate setting mechanisms for the proposition that state regulation can exempt an entire field of activity from antitrust scrutiny. *See Southern Motor Carriers,* 471 U.S. at 64, 105 S.Ct. at 1730; *Massachusetts Furniture and Piano Movers Ass'n v. FTC,* 773 F.2d 391 (1st Cir.1985); *New England Motor Rate Bureau, Inc. v. F.T.C.,* 908 F.2d 1064 (1st Cir.1990). To the contrary, what these cases stand for, to the extent they are still good law,[10] is that firms which comply with a state policy authorizing collective rate-setting activities are immune from antitrust attack, but only with respect to those activities which the state authorizes, and actively supervises. The distinction is important because the alleged activity at issue here was never authorized by the DPU. The DPU never adopted a policy of permitting NET to discriminate against COCOT owners. Neither did it adopt a policy that only current levels of service, and not higher ones, were in the public interest. If IMR's allegations of discrimination are true, they would, it seems,

violate the policy against discriminatory and unfair acts enshrined in Massachusetts public utility law. M.G.L. ch. 159 § 14. Neither DPU's mere failure to act against these allegations, nor its theoretical power to regulate such behavior, is enough to make such behavior the state's own, and immunize it from federal law. *Ticor,* 504 U.S. at 633–639, 112 S.Ct. at 2177–2179.

Finally, I note that my conclusions here are in accord with those of the two other Federal District Courts to consider similar issues. *See AT & T v. Eastern Pay Phones, Inc.,* 767 F.Supp. 1335 (E.D.Va.1991) *vacated as moot* 789 F.Supp. 725; *AT & T v. North American Industries,* 772 F.Supp. 777, 787–789 (S.D.N.Y.1991) *modified in part* 783 F.Supp. 810 (1992). In both of these cases, COCOT owners brought antitrust actions against LECs for their refusal to provide coin lines and/or call blocking services. Both courts found that, while the LEC in question was in fact subject to pervasive state regulation, no state policy supported the allegedly discriminatory conduct in question. *Eastern Pay Phones,* 767 F.Supp. at 1340–1342; *North American Industries,* 772 F.Supp. at 787–789, 783 F.Supp. at 812–813. As one court noted, no court:

Has ever suggested that anti-competitive activities inimical to the subject of the state legislation also are protected by the state action defense. Such a suggestion would transform a device created to protect state policy into a tool to undermine state policy. It would also transform the limited policy of federalism that underlay the original rule into an odd and sweeping canon of reverse preemption, with federal antitrust laws giving way to state regulation whether or not a violation of federal law is needed to help achieve the goal of such regulation.

*North American Industries,* 783 F.Supp. at 813.

**(2) *Unfair Competitive Practices***

■ A second category of IMR's claims relate to NET's alleged unfair tactics as a

---

**10.** In *Ticor,* 504 U.S. at 637–639, 112 S.Ct. at 2179, the Supreme Court specifically rejected the reasoning in *New England Motor Rate Bureau* which suggested that the mere theoretical power

of state officials to regulate some activity was sufficient to satisfy the "active supervision" prong of *Midcal.*

direct competitor for public pay telephone customers. These tactics include the making of allegedly disparaging remarks by NET representatives concerning the quality of COCOT service, the predatory placement of NET telephones in the vicinity of COCOTs, and allegedly uncompetitive commissions paid to location owners. As with IMR's quality of service complaints I find that none of these alleged activities are immunized by the state action doctrine.

Although the DPU has, in passing, made reference to or analyzed the significance of allegations similar to those here, there is nothing in the administrative record suggesting any coherent state policy promoting the activities alleged. In particular, NET retains full discretion in the placement of its pay telephones, as it does with the content of its advertising and the level of commissions it pays to location owners. Although the DPU apparently has authority to regulate these activities, it is equally apparent from the regulatory record that they have not done so to any significant degree. I thus conclude that Massachusetts has no policy regarding these activities, and they are, accordingly, not protected by state action immunity.

### (3) *NET's Alleged Conspiracy With ATT*

A third category of allegation involves NET's supposed conspiracy with ATT to exclude third-party COCOT owners from competing with NET's pay telephone service. Under this theory, IMR alleges that NET and ATT have an arrangement whereby ATT provides all of the long distance service to NET's pay telephones. It is thus in ATT's supposed interest to eliminate COCOT owners, which might use a long distance carrier other than ATT. The conspiracy allegedly involves a scheme whereby ATT and NET agreed not to address the security concerns of COCOT owners, as a means of forcing them out of the market. Since this allegation, if true, would certainly not further any articulated state policy, it is not immunized from antitrust attack by the state action doctrine.

### (4) *Rate Setting*

The final set of anti-competitive allegations against NET concern its charges to COCOT owners for access to NET's network, and to the public for the use of its pay telephone service. According to IMR, the charges incurred by COCOT owners are in excess of the effective rate which NET charges itself. Conversely, NET's charges for public pay telephone service are allegedly unreasonably low because they are cross-subsidized from other areas of NET's business. Under IMR's theory, NET's charges to COCOT owners make COCOT service charges to the public unreasonably high, while NET's cross-subsidy makes NET's service charges to the public unreasonably low. The net result is to squeeze COCOT owners out of the market.

I agree with NET that its tariffed rates, which are the product of an extensive investigation and review by the DPU, express a clearly articulated and actively supervised state policy, and are therefore immune from antitrust attack. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. As explained above, NET, unlike other pay telephone providers in Massachusetts, is considered a "dominant carrier" by the DPU. As such, its rates are subject to pre-approval and intense scrutiny and revision by the DPU. By comparison, the rates charged by COCOT owners are largely determined by the market.

Moreover, the DPU does not merely rubber-stamp proposed tariffs filed by NET. *Compare Ticor,* 504 U.S. at 637–639, 112 S.Ct. at 2179 (state agencies which were empowered to, but rarely did, seriously scrutinize rate filings, did not exercise active supervision over collective ratesetting scheme). Rather, the DPU actively and regularly scrutinizes NET's rate structure, and makes specific adjustments when it finds that proposed rates are not in the public interest. In its review of NET's rates, the DPU has taken into account a number of potentially conflicting public policy concerns, including aligning rates with marginal costs, simplicity, continuity, universal service, fairness, and earnings stability. *See New England Telephone and Telegraph Co.,* DPU 89–300 at 272, n. 123, 1990 WL 488888 (1990). Weighing all of these factors, the DPU has specifically found that the rates charged by NET for its pay telephone service, after adjustment by the

DPU, were appropriate in light of the afore-mentioned concerns. DPU 89–300 at 271–275. With respect to the rates charged to COCOT owners, the DPU recognized the existence of NET's cross-subsidy of its pay telephone rates and therefore ordered NET to modify its tariff to provide for a 20% discount to COCOT owners to counter the effect of this cross-subsidization. DPU 89–300 at 273.

In sum, by retaining NET's "dominant carrier" status, the DPU has expressed a clear intent to closely regulate the rates which NET charges to its customers, and has, in fact, mandated specific rates and changes in rates in light of public policy concerns. I therefore find that NET's rate structure is the direct product of state policy and is, accordingly, immune from antitrust attack at this time.[11] *Accord Coin Call, Inc. v. Southern Bell Tel. & Tel. Co.*, 636 F.Supp. 608, 613–614 (N.D.Ga.1986) (where state public service commission actively enforced telephone tariff and participated in its revision, and where particular tariff provision was in accord with explicit state commission policy, tariff provision was immunized from antitrust attack by state action doctrine).

### e. *Abstention*

 The DPU, as Amicus Curiae, has argued that even where this Court finds that the state action doctrine does not immunize certain of NET's alleged activities, it should nonetheless abstain, under the doctrine of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), from exercising jurisdiction in order to permit the DPU to respond to the allegations, through regulatory means, in the first instance. I decline this invitation.

In *Burford,* the Supreme Court held that it was sometimes appropriate for federal courts to abstain from exercising equity jurisdiction over disputes involving difficult or unsettled questions of state law, where such exercise would interfere with the state's own framework for developing the law in a particular field. 319 U.S. at 333–334, 63 S.Ct. at 1107. *See also Colorado River Water Cons. Dist. v.*

*U.S.,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244–1245, 47 L.Ed.2d 483 (1976); *Friends of Children, Inc. v. Matava,* 766 F.2d 35, 36 (1st Cir.1985). "[T]he state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1245.

As the First Circuit noted in *Construction Aggregates Corp. v. Rivera de Vicenty,* 573 F.2d 86, 92 (1st Cir.1978), cases in which abstention is appropriate typically involve interference with specialized state tribunals (*see Burford, supra* (special state court for settling claims on underground oil deposits); *Alabama Public Service Commission v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (special state court for reviewing decisions of public service commission); *Allstate Ins. Co. v. Sabbagh,* 603 F.2d 228, 233–234 (1st Cir.1979) (action for injunctive relief against insurance rate-setting commission, avoiding state mandated review by the Supreme Judicial Court); *Bettencourt v. Board of Registration in Medicine,* 721 F.Supp. 382, 384 (D.Mass.1989) *aff'd* 904 F.2d 772 (1st Cir.1990) (action for injunctive relief against medical licensing board); *Friends of Children, Inc. v. Matava,* 766 F.2d 35 (1st Cir.1985) (challenge to determination of Department of Social Services in adoption case)), or requests that federal courts intervene in disputes "involving a complicated system of local law presumably beyond the ken of a federal court." *Construction Aggregates,* 573 F.2d at 92. *See Burford, supra* (Texas law for allocate rights in underground oil deposits); *Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (Louisiana law empowering municipalities to take land by eminent domain); *Kaiser Steel Corp. v. W.S. Ranch Co.,* 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968) (case of first impression interpreting New Mexico statute governing water rights).

---

11. Of course if there came a time when NET's "dominant carrier" status were to change, these conclusions would need to be reconsidered.

However, not every case which raises these concerns is appropriate for abstention. "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244. *Burford* type abstention is reserved "for the relatively rare case where the equities strongly point in the direction of litigation exclusively in the state forum." *Construction Aggregates*, 573 F.2d at 92–93. In particular, there is "no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of state policy." *Id.* at 92 (quoting *Zablocki v. Redhail*, 434 U.S. 374, 380, n. 5, 98 S.Ct. 673, 678, n. 5, 54 L.Ed.2d 618 (1978)). Indeed, the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention. *Colorado River*, 424 U.S. at 815, n. 21, 96 S.Ct. at 1245, n. 21.

In light of these principles, I conclude that *Burford* abstention is not appropriate in this instance. This is so for two reasons. First, a fundamental requirement for *Burford* abstention is the existence a "difficult question of state law." *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244. The state law question I have considered, whether Massachusetts has a "clearly articulated" state policy concerning NET's allegedly anticompetitive practices is, by its very nature, not difficult.[12] *See Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1031 (9th Cir. 1989) *aff'd* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (*Burford* abstention inappropriate where court determined that state action doctrine did not bar antitrust claim); *Coin Call*, 636 F.Supp. at 609–612 (in antitrust case challenging defendant's refusal under its tariff to permit resale of telephone services, court would apply state action doctrine, rather than *Burford* abstention doctrine, to determine whether antitrust laws inappropriately interfered with state regulation). To the extent that there are difficult

claims before me, they arise out of federal antitrust and communications law, not the laws of Massachusetts.

Second, there is no danger that a ruling of this Court might interfere with Massachusetts' ability to make telecommunications policy. As described above, to the extent that NET's actions are already the product of "a clearly articulated and affirmatively expressed State policy," and subject to state supervision, those actions are immune from antitrust attack under the state action doctrine. *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943; *Ticor*, 504 U.S. at 631–633, 112 S.Ct. at 2176. In those areas where DPU has not yet articulated a policy and issued appropriate supervisory orders, nothing in this decision precludes it from doing so. Thus, the state action doctrine makes application of the *Burford* abstention doctrine superfluous in a case such as this.[13] *Coin Call*, 636 F.Supp. at 609–612.

For all of these reasons, I find that this is not a case in which the equities "point in the direction of litigation exclusively in the state forum," *Construction Aggregates Corp.*, 573 F.2d at 92–93, and I will not dismiss IMR's antitrust claims on that basis.

Accordingly, NET's motion to dismiss Counts I, III and IV is **DENIED**, except that NET's motion is **ALLOWED** with respect to the allegations in Counts III and IV concerning the rates charged by NET to COCOT owners.

### 2. The State Antitrust Counts (II, V and VI)

NET contends that the claims against it under the Massachusetts Antitrust Act (M.G.L. ch. 93) (Counts II, V and VI), are barred under a provision of that statute which excludes claims regarding activities which are "exempt from any of the federal antitrust laws ... or ... [a]ny activities which are subject to regulation or supervi-

---

12. Were it difficult to determine state policy, such policy would not be "clearly articulated."

13. I am, of course, aware of NET's unique status as the dominant LEC in Massachusetts, and of the significant impact that the outcome of this litigation could have on the development of telecommunications markets in the Commonwealth.

However, that fact does not alter my conclusions here. If the DPU believes that maintenance of the status quo is necessary for the orderly introduction of new technology into Massachusetts, it remains fully empowered to issue orders mandating that NET continue its current practices as a matter of policy.

sion by state ... agencies." The Massachusetts Supreme Judicial Court has construed this exemption to be no broader than that found under the federal "state action" doctrine discussed above. *See Commonwealth v. Mass. CRINC*, 392 Mass. 79, 90–91, 466 N.E.2d 792 (1984). In the absence of an explicit federal exemption, an activity only escapes state antitrust scrutiny if it is mandated by state law or regulation. *Id.* at 91, 466 N.E.2d 792. Accordingly, I find that NET's activities are immune under the Massachusetts antitrust statute only to the extent they are immune under federal law, as analyzed above: NET's motion to dismiss Counts II, V and VI is **DENIED**, except that it is **ALLOWED** with respect to the allegations in Counts V and VI concerning the rates charged by NET to COCOT owners.

### 3. *The Communications Act Claim*

Counts VII and VIII allege that, through the various practices described above, NET violated Sections 201(b) and 202(a) of the Communications Act of 1934, 47 U.S.C. §§ 201(b), 202(a), respectively. These provisions make it unlawful for common carriers to employ unjust and unreasonable charges and practices or to unfairly or unjustly discriminate among customers. Section 207 of the Act, 47 U.S.C. § 207, permits parties damaged by common carriers through violations of the Act to bring an action before the FCC or in federal court.

NET contends that these claims should be dismissed under the doctrine of primary jurisdiction. This doctrine is concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). It is invoked "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 64, 77 S.Ct. at 165. Under the doctrine, a court will decline to decide an issue which is best left to the expertise of an administrative agency.

The First Circuit has described three primary factors which this Court should consider in determining whether to defer to an administrative agency: (1) Whether the determination is at the heart of the task assigned to the agency by Congress; (2) whether agency expertise is required to unravel intricate, technical facts; and (3) whether the agency determination would materially aid the court. *New England Legal Found. v. Mass. Port Auth.*, 883 F.2d 157, 172 (1st Cir.1989). Analyzing these factors in this case, I conclude that the FCC has primary jurisdiction over IMR's Communications Act claims, which should, accordingly, be dismissed.

With respect to the first factor, there is no doubt that a determination of the reasonableness or discriminatory nature of common carrier rules and charges is squarely at the heart of the FCC's mandate. *See Ambassador v. United States*, 325 U.S. 317, 324, 65 S.Ct. 1151, 1155, 89 L.Ed. 1637 (1945); *National Comm. Ass'n v. AT & T*, 46 F.3d 220, 223 (2d Cir.1995); *In Re Long Distance Telecommunications Litigation*, 831 F.2d 627, 632 (6th Cir.1987); *MCI Communications Corp. v. AT & T*, 496 F.2d 214 (3rd Cir.1974); *Booth v. AT & T*, 253 F.2d 57, 58 (7th Cir.1958); *MCI Telecommunications Corp. v. Ameri–Tel, Inc.*, 852 F.Supp. 659, 665 (N.D.Ill.1994); *Southwestern Bell Telephone Co. v. Allnet Communications Services, Inc.*, 789 F.Supp. 302 (E.D.Mo.1992); *Eastern Pay Phones*, 767 F.Supp. at 1343. Indeed, the FCC was created by Congress specifically to enforce the provisions of the Communications Act of 1934, including Sections 201(b) and 202(a). *See* 47 U.S.C. § 151.

Neither can there be any doubt that the FCC has special expertise in this area. The Communication Act's prohibition of "unreasonable," "unjust" and "discriminatory" practices is a contentless injunction, which essentially invites the FCC to promulgate specific policies governing the practices of the telecommunications industry. *See Allnet Communication Service, Inc. v. National Exchange Carrier Association, Inc.*, 965 F.2d 1118, 1120–1121 (D.C.Cir.1992) ("judicial resolution of Allnet's claims here would preempt the Commission from implementing what

amount to policy decisions"); *Booth*, 253 F.2d at 58 ("Ratemaking is an administrative not a judicial function for to reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission.").

█ Such policy-making requires a detailed knowledge of the economics and standard practices of the telephone industry, and an understanding of the technical feasibility of various proposed alternatives. It is obvious that the FCC, and not this Court, is the body with both the expertise and the Congressional mandate to accomplish this task. Other courts considering this issue have, accordingly, consistently refused to adjudicate cases brought under the Communications Act without a clear statement of policy from the FCC. *See Ambassador v. United States*, 325 U.S. at 324, 65 S.Ct. at 1155; *National Exchange Carrier*, 965 F.2d at 1120–1123; *In Re Long Distance Telecommunications Litigation*, 831 F.2d at 632; *MCI Communications Corp. v. AT & T*, 496 F.2d at 214; *Booth v. AT & T*, 253 F.2d at 58; *Southwestern Bell*, 789 F.Supp. 302; *Eastern Pay Phones*, 767 F.Supp. at 1343.[14] Because IMR has not demonstrated that the FCC has ever addressed any of the issues raised in this action, I conclude that this Court should decline to rule on them at this time.

Finally, because the FCC has full power to grant the relief requested by IMR (*see* 47 U.S.C. §§ 206–207), nothing would be served by this Court retaining jurisdiction over these claims. *See Booth*, 253 F.2d at 59.[15] Accordingly, NET's motion to dismiss Counts VII and VIII is **ALLOWED**.

#### 4. *Claims for Violation of M.G.L. ch. 159*

In Count IX, IMR charges NET with violations of the Massachusetts Common Carri-

er Law, M.G.L. ch. 159, §§ 1, 13, and 17. Section 1 of the Law prohibits price discrimination by common carriers "of merchandise or other property," and grants the Supreme Judicial and Superior Courts jurisdiction in equity to enforce its provisions. Section 13 authorizes the DPU to inquire into the "rates, charges, regulations, practices, equipment and services of common carriers." Section 17 requires that all charges made by common carriers be "just and reasonable."

█ IMR contends that these sections create an implied cause of action under state law for damages caused by the actions of a common carrier which do not meet the standards of reasonableness and non-discrimination outlined above. I disagree.

Section 1 of the Law, which was enacted in 1869, applies only to "common carriers of merchandise or other property" and thus is inapplicable here. Section 13 merely authorizes investigations by the DPU. It too has no applicability here.

This leaves Section 17. This section, likes its federal analog (47 U.S.C. § 201(b)), requires that telephone service providers charge "reasonable rates." And, like the federal law, this one provides no definition of reasonableness, leaving the determination up to the appropriate administrative agency, in this case the DPU. *See* M.G.L. ch. 159 § 14.

█ The structure of this chapter makes it apparent that it is the DPU which must make determinations of reasonable rates in the first instance. *See Gurney Heater Mfg. Co. v. New York, N.H. & H.R. Co.*, 264 Mass. 427, 162 N.E. 897 (1928) (holding that Common Carrier Law abrogated prior judicially enforceable common law right against unrea-

---

**14.** Of course, once the FCC has made a determination that a rate or practice is reasonable (by approving a tariff incorporating such rate or practice), the courts are fully competent to award relief pursuant to such rule or practice. *See, e.g. MCI Telecommunications Corp. v. Ameri–Tel, Inc.*, 852 F.Supp. 659, 666 (N.D.Ill.1994).

**15.** There is also some question as to whether IMR has stated a claim under the Communications Act of 1934. This Act is inapplicable to intrastate communications service, 47 U.S.C. § 152(b), or to telephone exchange service. 47

U.S.C. § 221(b). These areas are regulated by the DPU. The crux of IMR's complaints, however, are that NET discriminated against it in the provision of local exchange service, namely by providing inferior line access and insufficient central office blocking services to COCOT customers. These complaints would appear to be solely within the jurisdiction of state law regulators. NET has not pressed this point, however, and since I find that the FCC has primary jurisdiction of these complaints to the extent they are governed by federal law, I need not pursue the matter further.

sonable rates by common carriers). The law provides that common carriers, including telephone service providers, must file rates with the DPU, which must approve them before they take effect. M.G.L. ch. 159 § 19. Once the DPU has made a final determination, it is appealable directly to the Supreme Judicial Court. M.G.L. ch. 25 § 5. Any rate approved by the DPU is considered to be *prima facie* lawful until it has been changed or modified by the DPU. M.G.L. ch. 159 § 17. It is thus clear that the requirement of Section 17 that rates be reasonable means that they must be reasonable as determined by the DPU in the first instance, with the role of the judiciary limited to a review of the DPU's determination. As with the federal law described above, it would clearly frustrate the intent of the legislature to create a regulatory regime governing telephone services if disgruntled consumers could resort directly to the courts to challenge the reasonableness of particular practices. The entire regime of administrative policy-making would thereby be undermined. Accordingly, I find that IMR has failed to state a claim under M.G.L. ch. 159. NET's motion to dismiss Count IX will, therefore, be **ALLOWED.**

### 5. *Common Law Claims*

In Counts X and XI, IMR alleges various state common law torts, to wit: Tortious interference with contractual relationship, business tort, unfair competition (Count X) and breach of duty (Count XI). NET contends that these claims are all preempted by the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, and by the Massachusetts Common Carrier Law, M.G.L. ch. 159, and that they otherwise fail to state claims cognizable under Massachusetts law.

IMR's Count X is captioned "Tortious Interference with Contractual Relationship/Business Tort/Unfair Competition" and alleges that NET "damaged IMR's pay phone business" by engaging in much of the conduct outlined in the previously discussed counts, including failing to provide adequate types and levels of service, failing to block fraudulent calls, and using predatory pricing practices to drive IMR from the market.

There is no generic "business tort" in Massachusetts, so I analyze the allegations to determine whether they state a claim for tortious interference with contractual relationship ("tortious interference") or unfair competition.

To prove a claim for tortious interference, the plaintiff must show that "(1) [it] had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract, and (3) the plaintiff was harmed by the defendant's action." *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 551 N.E.2d 20 (1990). The key issue here is whether NET knowingly induced a third party to break a contract with IMR. NET's mere refusal to cooperate with IMR, or the alleged breach of its own contract with IMR, will not, in itself, give rise to the tort. *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp 1188, 1199 (D.Mass.1990).

Nothing in the complaint suggests that NET's actions caused location owners to breach contracts with IMR. At most, IMR's allegations suggest that NET's practices made IMR's COCOTs unprofitable, which resulted in IMR breaking its contracts with location owners. In the absence of an allegation that NET directly interfered with location owners with whom IMR had a contract, IMR has failed to state a claim for tortious interference with contractual relations.

IMR also contends that the allegations in Count X make out a claim for "unfair competition." "[T]he gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of ... goods or services." *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 769–770, 489 N.E.2d 185 (1986); *Kazmaier v. Wooten*, 761 F.2d 46, 52 (1st Cir.1985). It addresses the same concerns as does a claim for trademark violation, preventing one firm from unfairly capitalizing on the consumer goodwill of another. *Datacomm*, 396 Mass. at 769–770, 489 N.E.2d 185.

None of the facts alleged by IMR suggest that unfair competition is an issue here, as that term is defined in Massachusetts common law. There is no allegation that NET

passed itself off as IMR, or that consumers have been confused about whether NET phones were really IMR phones. Indeed, one of IMR's complaints is that NET has been disparaging the quality of IMR's telephone service. This hardly suggests that NET would attempt to unfairly compete with IMR by attempting to appropriate IMR's customer goodwill.

▮▮▮▮▮▮ Finally, Count XI alleges that NET breached a duty to IMR by failing (negligently or intentionally) to block fraudulent calls made from IMR's COCOTs, and by failing to assist IMR in blocking such calls. IMR contends that NET, as a monopoly service provider, had a duty to cooperate with IMR in its attempts to eliminate fraudulent calling from its COCOTs. To the extent this count is a claim of negligence, it fails to state a claim. In Massachusetts, a plaintiff may not recover under a negligence theory for purely commercial losses, not grounded in physical harm. *Bay State–Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co.*, 404 Mass. 103, 107, 533 N.E.2d 1350 (1989); *Garweth Corp. v. Boston Edison Co.*, 415 Mass. 303, 613 N.E.2d 92 (1993).[16]

To the extent that IMR claims that NET had a common-law duty to prevent (or help IMR prevent) fraudulent calls, it fails to identify the source of that duty. The only authorities to which IMR refers in support of its claim are cases holding that the refusal of a monopolist to assist or cooperate with competitors may, under certain circumstances, constitute a violation of federal antitrust law. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368 (9th Cir.) *cert. den.* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). These cases say nothing about common law duties. There appears to be no general duty of a monopolist to assist those in competition with it. *See Olympia Equip. Leasing v. Western*

*Union Telegraph*, 797 F.2d 370, 375 (7th Cir.1986) *cert. den.* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987). To the extent that IMR is claiming a duty arising from the antitrust laws, such claims are redundant with the antitrust counts analyzed above.[17]

For these reasons, NET's motion to dismiss Counts X and XI is **ALLOWED**.

### 6. *Declaratory Judgment*

IMR's final count (XII) seeks a judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), declaring that IMR "owes no liability to NET" for past and future fraudulent calls; that NET should make numerous changes in the type of service it provides to IMR to facilitate the prevention of fraudulent calls; and that NET otherwise should cease its allegedly anti-competitive conduct in the Massachusetts payphone market. NET suggests that this count should be dismissed for the reasons it contends IMR's other counts are meritless. Moreover, NET once again urges this Court to exercise its discretion to abstain from issuing a declaratory judgment because such a declaration would impinge on matters best left to the regulatory efforts of the states. *See Bath Memorial Hosp. v. Maine Health Care Fin. Comm.*, 853 F.2d 1007, 1012 (1st Cir.1988). For the reasons stated in Part V.A.1, *supra,* I find these suggestions meritless, and will therefore **DENY** NET's motion to dismiss Count XII.

### B. *ATT's Motion for Summary Judgment and IMR's Motion Under Rule 56(f)*

ATT has moved for summary judgment against IMR on a single count alleging that IMR is liable for unpaid long distance charges for calls made from IMR's COCOTs, totalling in excess of $200,000. In lieu of an opposition to this motion, IMR has filed a motion pursuant to Fed.R.Civ.P. 56(f), by which it seeks an extension of time to re-

---

**16.** To the extent that NET had a contractual duty to prevent fraudulent calls, the failure to comply with this duty does not constitute a tort. Rather, it suggests nothing more than a breach of contract, one which IMR has not alleged. *See Bay State–Spray*, 404 Mass. at 107, 533 N.E.2d 1350.

**17.** NET also argues that IMR's common law claims are preempted by the state and federal laws regulating telecommunications. Because I find that IMR has failed to state a claim under any of the common law counts, I need not address this issue.

spond to ATT's motion, in order to conduct additional discovery.

■ Rule 56(f) permits this Court to suspend the consideration of a summary judgment motion pending the completion of further discovery. It may be granted whenever the party opposing summary judgment cannot "for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). The party making the motion must satisfy four requirements. It should:

> [1] articulate some plausible basis for the party's belief that specified "discoverable" material facts likely exist which have not yet come in from the cold. There must also be shown [2] some realistic prospect that the facts can be obtained within a reasonable (additional) time, and [3] will, if obtained, suffice to engender an issue both genuine and material. Last [4] the litigant must demonstrate good cause for failure to have conducted the discovery earlier.

*Paterson–Leitch v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 988 (1st Cir.1988).

■ In support of its motion, IMR claims that ATT is in possession of information which is essential to its defense. In particular, IMR contends that ATT possesses information which would support three distinct factual claims: (1) That certain of the disputed calls billed to IMR were operator-assisted calls which were incorrectly billed as direct-dialed, (2) that ATT was aware of the problem of secondary dial tone COCOT fraud, but failed to take reasonable steps to prevent it, and (3) that ATT had the technical capability to block the completion of international direct-dialed calls from IMR's COCOTs, but failed to do so when requested. IMR suggests that proof of any one of these claims could relieve it of liability for some or all of the disputed charges.

As required under *Paterson–Leitch,* IMR has also explained the factual basis for these claims. With respect to IMR's claim that

ATT mis-billed operator-assisted calls as direct-dialed, IMR's president states that he personally observed patrons make operator-assisted calls from IMR's COCOTs which were subsequently billed as direct-dialed. He also claims to have made such calls himself. With respect to secondary dial tone fraud, IMR has submitted documents obtained from ATT suggesting that ATT was aware of the problem of secondary dial tone fraud, and had developed, but had not implemented, a technical solution to the problem. Finally, in support of its claim that ATT was capable of blocking international long distance calls, IMR has submitted a deposition transcript, from an unrelated case, in which an ATT representative states that when a customer orders certain call blocking features from its LEC, the LEC transmits to ATT a special code with each dialed call, which informs ATT of this fact.[18]

Finally, and as also required by *Paterson–Leitch,* IMR argues that it was incapable of obtaining this discovery at an earlier date. In particular, IMR contends that it was prevented from completing its discovery in these areas because of a November 13, 1991 discovery order of this Court. Under the terms of that order, all deposition discovery relating to ATT's claim against IMR was suspended pending the resolution of NET's motion to dismiss the amended third party complaint. This order was issued approximately one year after IMR was served in this action, but only 13 days after ATT completed its response to IMR's first request for production of documents.[19]

Based on the foregoing, I am satisfied that IMR has clearly met three of the four *Paterson–Leitch* requirements: That it articulate a plausible basis for the existence of the facts it seeks, that it show a realistic prospect of obtaining those facts, and that it demonstrate a good cause for its failure to obtain the evidence at an earlier date. 840 F.2d at 988. With respect to the fourth requirement, that IMR show that the facts it seeks to discover are material, I believe that the question is closer.

---

**18.** Such a code would alert ATT of the fact that the call was being made from a restricted phone and would permit ATT, if it so chose, to refuse to put the call through.

**19.** IMR served its request on April 2, 1991.

In order to evaluate the materiality of the evidence IMR proposes to investigate, it is first necessary to review the legal principles governing IMR's liability to ATT. Because ATT is an interstate communications common carrier, liability for its long distance service is governed by the tariffs which ATT must file with the FCC. *MCI Telecommunications Corp. v. Ameri–Tel, Inc.,* 852 F.Supp 659, 667 (N.D.Ill.1994); *AT & T v. New York City Human Resources Administration,* 833 F.Supp 962, 970–971 (S.D.N.Y.1993). Such tariffs are not mere contracts, but have the force of law. *Palermo v. Bell Tel. Co. of Pa.,* 415 F.2d 298, 300 n. 3 (3d Cir.1969); *Carter v. AT & T,* 365 F.2d 486, 496 (5th Cir.1966) *cert. den.* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *New York City,* 833 F.Supp at 970–971; *AT & T v. Florida–Texas Freight, Inc.,* 357 F.Supp 977, 979 (S.D.Fla.), *aff'd* 485 F.2d 1390 (5th Cir.1973).

The charges at issue here are governed by ATT's Tariff F.C.C. No. 1 ("the Tariff"), the tariff applicable to long distance message telecommunication service ("LDMTS"). Under Section 2.4.1.A of the Tariff, a "customer" is responsible to pay for all calls which originate at its number, whether or not they are fraudulent. *See Lockhard v. C & P Telephone,* 50 F.C.C.2d 793 (1975); *Chartways Technologies, Inc. v. ATTCOM,* 8 F.C.C.R. 5601 (1993); *AT & T v. Jiffy Lube International,* 813 F.Supp. 1164, 1167 (D.Md. 1993); *New York City Human Resources Administration,* 833 F.Supp. at 970–974. *Cf. MCI Telecommunications Corp. v. Ameri–Tel, Inc.,* 852 F.Supp. at 667–668 (interpreting similar provision in MCI tariff).[20]

IMR is liable, therefore, only if it was ATT's customer within the meaning of the Tariff. Tariff Section 2.10 defines customer, somewhat circularly, as "the person or legal entity which orders LDMTS (either directly or through an agent) and is responsible for payment of tariffed charges for services furnished to that Customer." *See United Artists Payphone Corp. v. New York Telephone,* 8 F.C.C.R. 5563 (1993) at ¶ 9. In interpreting this provision, the FCC has held that a COCOT owner can become the customer of a long distance carrier in one of two ways: Either it can order a particular service from the carrier for which it agrees to pay the charges, or it can, through negligence, fail to prevent individual COCOT users from routing long distance calls through the carrier, even where the COCOT owner and the carrier have no existing agreement. *United Artists Payphone,* 8 F.C.C.R. 5563 at ¶¶ 9–15.[21] Not every request for service, however, results in a customer relationship. Some types of service, such as operator assisted service, are not intended to be billed to the originating number, and therefore do not result in the creation of a customer-carrier relationship. *United Artists Payphone,* 8 F.C.C.R. 5563 at ¶ 11.

In *United Artists Payphone,* the FCC considered whether a COCOT operator, which had not presubscribed to any long distance carrier, and which did not, in fact, offer any long distance service from its pay phones, was liable to ATT for long distance calls fraudulently completed from them. The FCC determined that there was no liability. The FCC first noted that since the COCOT owner had not presubscribed to any long distance service, it had taken no affirmative steps to form a customer relationship with

---

**20.** The FCC has recently announced that it is considering the adoption of new rules which would limit the liability of COCOT operators for fraudulent calls under certain circumstances. *See In re Policies and Rules Concerning Toll Fraud,* 8 F.C.C.R. 8618 (1993) at ¶¶ 27–31. Because such rules were not in force at the time the disputed calls were made, and can only apply prospectively, they are irrelevant to the analysis here. *See AT & T Co. v. FCC,* 978 F.2d 727, 732 (D.C.Cir.1992) *cert. den.* —— U.S. ——, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993); *MCI Telecommunications Corp. v. Ameri–Tel, Inc.,* 852 F.Supp 659, 663 (N.D.Ill.1994).

**21.** The FCC's interpretation must be accorded great weight by this Court. *See F.C.C. v. WNCN Listener's Guild,* 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) ("[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong."); *New York City Human Resources Administration,* 833 F.Supp. at 971. *See also AT & T v. United Artists Payphone Corp.,* 1990 WL 200653 (S.D.N.Y.1990) (referring case of first impression involving liability of COCOT owner for fraudulent calls to FCC under doctrine of primary jurisdiction).

ATT. The FCC then turned to the question of whether the COCOT owner had taken reasonable steps to prevent users of its COCOTs from billing calls to ATT. The FCC found that the COCOT owner had taken a number of such steps. In addition to not presubscribing to any long distance carrier (thus preventing the dialing of (1+) long distance calls), the owner had also subscribed to services provided by the LEC which blocked the use of 10XXX codes to route long distance calls to specified carriers. Moreover, whenever a customer requested operator service, a recording generated by the phone informed the operator of restrictions on service. Finally, whenever the COCOT owner discovered fraudulent use of long distance service from its phones, it reported the fraud both to the LEC and to ATT. The FCC found that these measures constituted reasonable steps by the COCOT owner to prevent unauthorized long distance calling from its phones, and concluded that it should not be held liable for the fraudulent calls. *United Artists Payphone*, 8 F.C.C.R. 5563 at ¶ 15.

■ Two principles concerning COCOT liability can be derived from the foregoing discussion. First, when a COCOT owner orders direct-dialed service from a long distance carrier, that carrier's sole legal obligation is to place all direct-dialed long distance calls dialed from the customer's number. Conversely, it has no legal obligation to inquire into the nature or validity of the calls emanating from the number, or to warn customers of potential fraud. *Jiffy Lube*, 813 F.Supp. at 1168–1169; *New York City Human Resources Administration*, 833 F.Supp. at 970–978; When a customer orders direct-dialed long distance service, and attaches its equipment to the telephone grid, it bears the sole responsibility of insuring that no unauthorized calls are directly-dialed from

its equipment. *See Lockhard*, 50 F.C.C.2d at 793; *Chartways Technologies, Inc.*, 8 F.C.C.R. at 5601; *Jiffy Lube*, 813 F.Supp. at 1167–1169; *New York City Human Resources Administration*, 833 F.Supp. at 970–978; *Ameri–Tel, Inc.*, 852 F.Supp. at 667; *United Artists*, 8 F.C.C.R. 5563 at ¶ 9.

■ Second, a COCOT owner is not, as a general rule, liable for operator-assisted calls made from its numbers. *United Artists*, 8 F.C.C.R. 5563 at ¶ 10, 11. Unlike direct-dialed calls, operator-assisted calls carry with them no presumption that the call will be billed to the originating number. *Id.* Nonetheless, the COCOT owner may be held liable for such calls if it failed to take reasonable steps to prevent unauthorized callers from gaining access to ATT's network. *Id.* at ¶ 13.

In light of these principles, I conclude that the facts IMR seeks to discover concerning operator assisted calls would be material to the disposition of ATT's summary judgment motion, and that IMR should, therefore, be given an opportunity to discover them. IMR is not strictly liable for operator-assisted calls in the way that it is for direct dialed calls. Therefore, if IMR can show that certain of the disputed calls were in fact operator-assisted calls, it can avoid liability for them by showing that it took reasonable steps to avoid fraudulent calls.

■ I find, however, that additional discovery in the remaining areas, concerning ATT's knowledge of secondary dial tone fraud, and ATT's ability to block international direct dial calls, would not be material to this dispute. Both of these areas involve calls which are directly dialed and for which IMR is, accordingly, strictly liable. IMR has not articulated how any additional discovery in these areas could change the outcome of this case.[22]

---

22. In particular, IMR has not explained why ATT had any duty to act to prevent such fraud. ATT's duty to IMR is governed by the mandatory terms of ATT's filed tariffs. *See Ivy Broadcasting Co. v. AT & T*, 391 F.2d 486, 491–492 (2d Cir.1968); *AT & T v. Florida–Texas Freight, Inc.*, 357 F.Supp 977 (S.D.Fla.1973) *aff'd* 485 F.2d 1390 (5th Cir. 1973); *Marco Supply Co. v. AT & T Communications*, 875 F.2d 434, 436 (4th Cir.1989); *MCI*

*Telecommunications Corp. v. TCI Mail, Inc.*, 772 F.Supp 64, 66–67 (D.R.I.1991). *Cf. Maislin Indus. U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990) (under Interstate Commerce Act "[t]he rights defined by the tariff cannot be enlarged by either contract or tort of the carrier.... This stringent rule prevails because otherwise the paramount purpose of Congress—prevention of un-

Accordingly, I will **ALLOW** IMR's motion under the following conditions: IMR will have 120 days from the date of this decision to conduct depositions of ATT personnel. The scope of such depositions will be limited to questions in the following subject area: ATT's practices, policies, and procedures for routing, handling, screening, recording and billing operator-assisted calls. IMR is directed to file its opposition to ATT's motion for summary judgment, with respect to all issues raised in ATT's motion, within 45 days of the end of this 120 day period.[23]

### C. *ATT's Motion to Dismiss in No. 92–10919*

In No. 92–10919, IMR charges ATT in a 12 count complaint with having violated the federal and state antitrust laws (Counts I through VI) and the Communications Act of 1934 (Counts VII and VIII), and having committed various state law torts[24] (Counts IX through XI). IMR also seeks a declaratory judgment with respect to the aforementioned claims (Count XII). In essence, there are three factual allegations underlying all of these counts. First, IMR claims that ATT, independently and in conspiracy with NET, has refused to provide call screening and call blocking services needed by IMR to effectively prevent fraudulent long distance calls from being made from its COCOTs. This allegation serves as a basis for all of the antitrust counts (I–VI), the Communications Act counts (VII and VIII), and the state tort counts (IX–XI). Second, IMR claims that ATT discriminated against it by selectively

seeking to collect payments for fraudulent calls made from IMR's COCOTs, while not attempting to collect such payments from NET. IMR uses this claim to support all of the aforementioned counts except those relating to the alleged antitrust conspiracy (I and II). Finally, in support of its claims of violation of M.G.L. chapter 93A (Count IX) and of tortious interference with contractual relations (Count X), IMR alleges that ATT has, through an advertising campaign, encouraged pay telephone customers to select ATT long distance through the use of 10XXX dialing. From this, IMR somehow concludes (the implication is never explained) that IMR's customers were encouraged to commit secondary dial tone fraud.

### 1. *Standard of Review*

As noted above, a complaint must not be dismissed under Fed.R.Civ.P. 12(b)(6) unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). In making this determination, a court should accept the well-pleaded complaint as true and indulge every reasonable inference in favor of the plaintiff. *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990). This standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." *U.S. v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992). "[A] reviewing court is obliged nei-

---

just discrimination—might be defeated."); *United States v. Associated Air Transport, Inc.*, 275 F.2d 827, 832–833 (5th Cir.1960) (tariff filed with Civil Aeronautics Board was the "sole standard for services to be rendered and charges assessed and collected"); *Atchison, T. & S.F. Ry. Co. v. Springer*, 172 F.2d 346, 349–350 (7th Cir.1949); *Jarka Corp. of Baltimore v. Penn. R.R. Co.*, 130 F.2d 804 (4th Cir.1942).

It is undisputed, however, that ATT's tariff did not require (or even permit) the type of call screening or call blocking services to which IMR claims to have been entitled. Thus, failure to provide such screening or blocking could not constitute a breach of ATT's duty to IMR, and is thus not a bar to recovery. *Jiffy Lube*, 813 F.Supp. at 1169; *New York City Human Re-*

*sources Administration*, 833 F.Supp. at 977; *Chartways*, 8 F.C.C.R. 5601 at ¶ 16.

**23.** In addition to the areas discussed above, IMR seeks to conduct additional discovery of facts concerning "remaining affirmative defenses, including violations of the Communications Act of 1934 and the Federal antitrust laws." This request is denied because IMR has not satisfied the *Paterson–Leitch* requirements that it demonstrate the existence of such facts, that it show that they had a realistic prospect of obtaining them from ATT, and that it show how they are material to its defense.

**24.** Count IX alleges unfair competition, in breach of M.G.L. ch. 93A. Count X alleges Tortious Interference with Contractual Relationships. Count XI alleges "Violation of Duty of Due Care and Gross Negligence."

ther to "credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation, nor to honor subjective characterizations, optimistic predictions, or problematic suppositions. '[E]mpirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." *Id.* (citations omitted). In particular, a complaint containing vague pleadings lacking the requisite factual allegations of an antitrust claim is insufficient to state a cause of action. *Americana Industries, Inc. v. Wometco de Puerto Rico, Inc.,* 556 F.2d 625, 627 (1st Cir.1977); *Gilbuilt Homes, Inc. v. Continental Homes of New England,* 667 F.2d 209 (1st Cir.1981).

### 2. *Antitrust Counts (I–VI)*

■■■■ In order to establish a claim under Section 1 or 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, IMR must either show that ATT committed one of a limited category of *per se* antitrust violations (*see U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 593–594 (1st Cir.1993)), or prove its case under the so-called "Rule of Reason." [25] *Sullivan v. National Football League,* 34 F.3d 1091, 1096 (1st Cir.1994) *cert. den.* —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995). Because IMR has not alleged a *per se* antitrust violation,[26] Rule of Reason analysis is applicable here.

■■■■ When applying the Rule of Reason, a court weighs the anti-competitive effects of the defendant's actions against any legitimate business justifications for them. *Sullivan,* 34 F.3d at 1096. As a preliminary matter, however, the plaintiff in such a case must first demonstrate that the defendant is capable of causing antitrust harm by showing that it (the defendant) can exercise "market power" in the relevant market. *See Lee v. Life Insurance Co. of North America,* 23 F.3d 14, 16–17 (1st Cir.1994) *cert. den.* —— U.S. ——, 115 S.Ct. 427, 130 L.Ed.2d 340 (1994); *Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 798 (1st Cir.

1988); *Sanjuan v. American Board of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994); *C.R. Bard v. Medical Electronics Corp.,* 529 F.Supp. 1382, 1389 (D.Mass.1982); *Shepherd Intelligence Systems, Inc. v. Defense Technologies, Inc.,* 702 F.Supp. 365, 369 (D.Mass.1988); *M & M Medical Supplies and Service, Inc. v. Pleasant Valley Hospital, Inc.,* 738 F.Supp. 1017, 1021 (S.D.W.Va.1990) *aff'd in part, vacated in part,* 946 F.2d 886 (1991). Market power exists when a firm is able to raise prices above the levels that would be charged in a competitive market. *NCAA v. Board of Regents,* 468 U.S. 85, 109, n. 38, 104 S.Ct. 2948, 2964, n. 38, 82 L.Ed.2d 70 (1984). It is the ability to raise prices above the marginal rate without a total loss of sales. *SCFC ILC, Inc. v. Visa USA, Inc.,* 36 F.3d 958, 965 (10th Cir.1994).

In a theoretically competitive market, the price of a commodity equals its marginal cost. Any attempt by a firm to charge a higher price would immediately be undercut by other firms which, at the margin, could produce additional amounts of the commodity at the current price. When one firm in a market has market power, this system of competitive checks breaks down. The firm with market power is able to raise prices above marginal cost because its competitors are not able to "take up the slack" of customers who turn away from this firm. This may result from poor supply elasticity of existing competitors or barriers to market entry, both of which would prevent other firms from providing substitute goods at marginal cost. *See* Areeda & Turner, Antitrust Law § 507 (1978).

■■■ A demonstration of market power is essential to proving Rule of Reason antitrust claims because without such power, a firm attempting to reap monopoly profits or to discriminate against competitors would be undercut by other firms who could provide cheaper goods or cater to the excluded firms. Thus, without market power, a firm is unable

---

**25.** The requirements under the Massachusetts Antitrust Act, M.G.L. ch. 93, are identical. *C.R. Bard, Inc. v. Medical Electronics Corp.,* 529 F.Supp. 1382, 1391 (D.Mass.1982).

**26.** "Today, the only serious candidates for this label are price (or output) fixing agreements and certain group boycotts or concerted refusals to deal." *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 593 (1st Cir.1993).

to achieve the evil which antitrust laws are intended to prevent. Since the ultimate goal of antitrust law is the protection of consumers through the maintenance of competitive markets, a failure to show market power is fatal to an antitrust claim analyzed under the Rule of Reason. *See SCFC,* 36 F.3d at 965; *Lee,* 23 F.3d at 16; *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Industries, Inc.,* 889 F.2d 524, 529 (4th Cir.1989); *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 316 (8th Cir.1986).

■■ In the instant case, IMR claims that ATT has used its market power as a supplier of long distance telephone services in an attempt to drive IMR out of the pay telephone market in Massachusetts. In particular, IMR asserts that it was damaged by ATT's refusal (individually and in concert with NET) to block fraudulent long distance calls from IMR's COCOTs and by ATT's attempts to collect charges for such calls. In order for these charges to support an antitrust claim, IMR would have to show that ATT was able to inflict this damage on IMR as a result of market power. In other words, IMR would have to prove that it was economically feasible (for ATT or a potential competitor) to provide the service which IMR demanded, but that ATT's market power permitted it to refuse to provide such service and to prevent IMR from obtaining the demanded service from alternative sources. *See Lee,* 23 F.3d at 16 ("market power is the demonstrated ability of a seller to force a purchaser to do something that he would not do in a competitive market" *quoting Jeffer-*

*son Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 14, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984)). After reviewing IMR's complaint, I conclude that it contains no factual allegations showing that ATT exercised market power to IMR's detriment. Because IMR has therefore not alleged any antitrust injury, its antitrust claims must be dismissed. *Americana Industries,* 556 F.2d at 627.

■■ While IMR does allege broadly that ATT possesses market power in what it describes as the "pay phone long distance market," the complaint contains no specific factual allegation that ATT was able to use this alleged market power to force disadvantageous conditions on IMR. *See Lee,* 23 F.3d at 16. Moreover, IMR's own factual allegations completely undermine its claim that ATT had market power at all. IMR admits that, when it became dissatisfied with ATT's service, it switched the long distance carrier for all of its COCOTs to other carriers, and in particular to MCI. IMR also alleges that MCI offered it the type of fraud protection it had requested from ATT, and at a price which IMR suggests allows it to compete with pay phones subscribed to ATT's service. Thus, nothing in the complaint suggests that IMR was ever constrained from switching its long distance carrier at any time, or that alternative suppliers were unable to satisfy demand. This omission strongly suggests that ATT does not have market power with respect to IMR and is fatal to IMR's claim that it was damaged by an exercise of market power by ATT.[27]

---

27. IMR bases its claim that ATT possesses market power on the allegation that ATT controls 90% of the "pay phone long distance market" in Massachusetts. This allegation is of dubious significance. The FCC has found that the market for long distance business services (of which service to COCOT owners is a part), is "substantially competitive", *In re Competition in the Interstate Interexchange Marketplace,* 6 F.C.C.R. 5880 at ¶ 36 (1991), and IMR has provided no basis to treat the market for long distance services to pay telephones (or COCOTs) as distinct from this larger market.

Moreover, even leaving aside the question of whether the "pay phone long distance market" is a meaningful construct, the mere allegation of high market share is insufficient to support IMR's claim of market power. Market share "is just a way of estimating market power, which is

the ultimate consideration." *Ball Memorial Hosp. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1336 (7th Cir.1986). If an examination of the market shows that, in fact, there are no barriers to competition, the market share presumption is negated. *Id. See also U.S. v. Syufy Enters.,* 712 F.Supp. 1386 (N.D.Cal.1989) *aff'd* 903 F.2d 659 (9th Cir.1990) (showing that theater operator had 84.1 percent of gross box office receipts for first-run films in relevant market did not establish monopoly power because entry barriers in market were very low); *Bacchus Indus. v. Arvin Indus.,* 939 F.2d 887, 894 (10th Cir.1991) (with lower entry barriers and many small firms in market, no "dangerous probability" of monopoly notwithstanding defendant's 55 to 60 percent market share).

Here, IMR's own allegations show that it was not constrained by market power because it was

*Lee,* 23 F.3d at 16. A practice is anti-competitive only if it harms the competitive process, not if it merely harms competitors. *Picker Intern., Inc. v. Leavitt,* 865 F.Supp. 951, 961 (D.Mass.1994); *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 21 (1st Cir.1990) *cert. den.* 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991). Here, IMR alleges that it was harmed by ATT's actions, but does not explain how that damage arises out of ATT's exercise of market power. Accordingly, because IMR does not allege sufficient facts to show antitrust injury, ATT's motion to dismiss Counts I–VI is **ALLOWED.**[28]

### 3. *The Communications Act Counts (VII–VIII)*

In Counts VII and VIII, IMR alleges that ATT violated Sections 201(b) and 202(a) of the Communications Act of 1934 by unreasonably charging IMR for fraudulent calls made from its payphones (Count VII) and by discriminating against IMR by attempting to collect charges for fraudulent calls made from IMR's pay telephones but not attempting to collect charges for such calls made from NET's payphones (Count VIII).

With respect to Count VII, the FCC has held that it is not unreasonable or unfair for a customer of a long distance carrier to be held liable for fraudulent direct-dialed long distance calls made from its phones. *See Chartways Technologies, Inc. v. ATTCOM,* 8

F.C.C.R. 5601 (1993) at ¶ 16. A COCOT owner may avoid such liability only where it does not subscribe to the long distance carrier's service and takes reasonable steps to prevent fraudulent calls from being routed to that carrier. *See United Artists Payphone Company v. New York Telephone,* 8 F.C.C.R. 5563 (1993) at ¶ 9, 13, 15; *In re Policies and Rules Concerning Toll Fraud,* 8 F.C.C.R. 8618 (1993) (discussing proposed rule changes which would relieve a COCOT owner of liability for fraudulent calls, but only where those calls are made through a long distance carrier of which it is not a pre-subscribed customer). However, absent a showing that the COCOT owner failed to take reasonable steps to prevent fraud, it is not reasonable for a long distance carrier to attempt to collect charges for operator assisted calls made from the owner's phones. *United Artists Payphone,* 8 F.C.C.R. 5563 at ¶ 10, 11, 13, 14, 15.

■■■ As explained above, this Court will defer to the FCC's determination of reasonableness under Section 201(b). *Ambassador v. United States,* 325 U.S. 317, 324, 65 S.Ct. 1151, 1155, 89 L.Ed. 1637 (1945); *National Comm. Ass'n v. AT & T,* 46 F.3d 220, 223 (2d Cir.1995); *In Re Long Distance Telecommunications Litigation,* 831 F.2d 627, 632 (6th Cir.1987); *MCI Communications Corp. v. AT & T,* 496 F.2d 214 (3rd Cir.1974); *Booth v. AT & T,* 253 F.2d 57, 58 (7th Cir.1958); *MCI Telecommunications Corp. v. Ameri–Tel, Inc.,* 852 F.Supp 659, 665

able to switch to a supplier which provided it with what it demanded, at a competitive price. *See U.S. v. AT & T Co.,* 552 F.Supp 131, 170–172 (D.D.C.1982) (describing why ATT was unlikely to have market power after equal access rules were implemented, notwithstanding its high market share). Thus, any implication of market power from ATT's market share is rebutted by IMR's own factual claims.

28. In *AT & T v. Eastern Pay Phones,* 767 F.Supp. 1335, 1338–1339 (E.D.Va.1991), the court refused to dismiss antitrust counts against ATT which were based on allegations similar to those raised in this action. In *Eastern,* a COCOT owner, which had not pre-subscribed to ATT, alleged that ATT, by failing to block fraudulent calls routed through ATT from the COCOT owner's pay phones, was attempting to drive non-ATT subscribing pay phones out of business. ATT moved to dismiss the claim on the ground that the COCOT owner had failed to allege injury

from anti-competitive conduct. The court refused to dismiss, reasoning that AT & T's alleged conduct was anti-competitive, and any injury arising therefrom was antitrust injury cognizable under the antitrust laws.

The *Eastern* court, however, never addressed the question of whether ATT had the market power to inflict antitrust injury on the COCOT owner. Moreover, the facts in *Eastern* are distinguishable from those here because the COCOT owner in Eastern was not an ATT customer. Rather, it was a customer of one of ATT's competitors and ATT's allegedly anti-competitive conduct did not arise from the COCOT owner's customer relation with AT & T. Thus there was never a question of whether the COCOT owner could switch long-distance carriers to avoid ATT's practices. For these reasons, I do not find *Eastern* to be persuasive authority on the question of whether IMR suffered an antitrust injury in this case.

(N.D.Ill.1994); *Southwestern Bell Telephone Co. v. Allnet Communications Services, Inc.,* 789 F.Supp. 302 (E.D.Mo.1992); *Eastern Pay Phones,* 767 F.Supp. at 1343. As discussed in Part V.B, *supra,* ATT claims that all of the disputed charges are for direct-dialed long distance calls. IMR, in turn, claims that some significant portion of these calls were, in fact, negligently completed by an ATT operator. For the reasons stated in Part V.B., I find that, to the extent these calls were direct-dialed, it was not unreasonable for ATT to attempt to collect charges on them. Also for the reasons stated in Part V.B, however, I find that it would be unreasonable for ATT to attempt to collect these charges if they were for operator-assisted calls and if IMR took reasonable steps to prevent fraud. Accordingly, ATT's motion to dismiss Count VII is **ALLOWED** with respect to the collection of charges for direct-dialed calls and **DENIED** with respect to the collection of charges for operator-assisted calls.

▇▇▇▇ Count VIII alleges that ATT discriminated against IMR because it never attempted to collect charges for fraudulent calls made from NET pay telephones, while attempting to collect such charges from IMR. In order for this claim to stand, IMR would have to show: 1) That NET did indeed incur charges owed to ATT as a result of fraudulent calls and 2) that IMR was damaged by ATT's failure to collect such charges from NET. As long as the charges against IMR were legitimate, however, the mere fact of discrimination in charging will not result in a forfeiture of those charges to IMR. *See New York City Human Resources Administration,* 833 F.Supp. at 980.

ATT has presented authority that NET is not its customer with respect to the provision of long distance services from NET's pay telephones. In 1985, the FCC ruled that NET's pay telephones were part of its regulated service as an LEC, and that when ATT provided long distance service on those phones, it was the users of those phones who were ATT's customers. *See In re Petition for Declaratory Ruling of Tonka Tools, Inc.,* FCC 85–269 (1985) at ¶ 12. In essence, the FCC ruled that NET's pay telephones are to be treated in the same way as its telephone lines and central switching equipment: As a service provided to end users through which the end users may access long distance providers. This position suggests that NET is no more responsible for fraudulent calls made from its pay telephones than it is responsible for calls made by third parties using any other of its central office facilities.

▇▇▇ IMR suggests that the *Tonka Tools* ruling is out of date and is inapposite to the question of whether ATT should bill NET for fraudulent calls. In 1987, however, the FCC's Informal Complaints and Public Inquiries Branch ("the Informal Complaints Branch") addressed the precise issue raised by IMR, on a complaint made by the New York State Public Service Commission on behalf of various COCOT owners. In a letter ruling, the Informal Complaints Branch stated that Section 202(a) prohibited only unreasonable discrimination in billing practices, and that the reasonableness of ATT's practice of not billing LEC's for fraudulent pay phone calls had to be determined in light of the differences in the technology used by COCOTs and LEC-owned pay telephones. ATT had claimed that its billing system lacked the capability of billing LEC's for calls made from their "coin-line" pay phones. After receiving submissions from ATT concerning ATT's procedures for investigating toll fraud and its prevalence in the industry, the Informal Complaints Branch recommended no further action be taken on the complaint.

While the aforementioned opinion letter is not binding precedent, this Court agrees with it that the reasonableness of ATT's alleged billing discrimination must be viewed in light of its technical ability to bill LECs for fraudulent calls. Thus, to the extent that *Tonka Tools* does not foreclose IMR's claim, I will still dismiss it under the doctrine of primary jurisdiction. As stated above, questions of reasonableness under the Communications Act are within the special expertise of the FCC, and this claim should be addressed to that agency in the first instance. *Ambassador,* 325 U.S. at 324, 65 S.Ct. at 1155; *National Comm. Ass'n,* 46 F.3d at 223; *In Re Long Distance Telecommunications Litiga-*

*tion,* 831 F.2d at 632; *MCI Communications Corp.,* 496 F.2d at 214; *Booth,* 253 F.2d at 58; *Ameri–Tel, Inc.,* 852 F.Supp. at 665; *Southwestern Bell,* 789 F.Supp. at 302; *Eastern Pay Phones,* 767 F.Supp. at 1343. Accordingly, ATT's motion to dismiss Count VIII is **ALLOWED.**

#### 4. *Chapter 93A Claim (Count IX)*

In Count IX, IMR alleges that ATT's attempt to collect charges from IMR for fraudulent calls, its refusal to block those calls, and its campaign to encourage pay phone users to use its 10XXX access code from IMR's pay phones [29] all constitute violations of M.G.L. ch. 93A, which prohibits businesses from engaging in "unfair or deceptive acts or practices." M.G.L. ch. 93A §§ 2, 11. A claim under ch. 93A need not be premised on a violation of an independent common law or statutory duty, so long as the complained of conduct is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness ... [or] is immoral, unethical, oppressive, or unscrupulous." *Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.,* 403 Mass. 722, 729, 532 N.E.2d 660 (1989). Chapter 93A provides for the award of double or treble damages and attorneys fees to successful plaintiffs. M.G.L. ch. 93A, § 11.

ATT contends that IMR's allegations under this count are, in essence, the same as those found under its antitrust and Communications Act counts, and should, for the same reasons, be dismissed. In response, IMR contends that its allegations are sufficient to state claims under theories of fraud or "breach of duty," which claims it asserts would be actionable under Chapter 93A.

I agree with ATT that IMR's allegations fail to state a claim. None of IMR's allegations suggests that ATT committed fraud. Fraud entails the intentional misrepresentation of a material fact. *Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221, 226 (D.Mass.1990). In the instant case, IMR has

not alleged that ATT made any material misrepresentations. At most, IMR alleges that ATT failed to advise IMR that fraudulent calls were being made, and failed to prevent such calls from being made. But IMR admits that it was aware that such fraudulent calls were being made and, nevertheless, continued to subscribe to ATT's services, thus permitting more calls of this type to be completed. There was no deception here, only an above-board disagreement between the parties as to whom was responsible for preventing such calls.

Nor do the allegations come within the penumbra of any articulable statutory or common-law concept of unfairness. IMR makes vague references to ATT's breach of a "duty of care" which it allegedly had to IMR, but points only to an argument concerning ATT's alleged negligence (*see* Part V.C.6, *infra*). Ordinary negligence alone, which does not "reek of callousness" or "meretriciousness," is not the sort of "truly inequitable marketplace behavior" which Chapter 93A was intended to punish. *VMark Software, Inc. v. EMC Corp.,* 37 Mass.App.Ct. 610, 624, 642 N.E.2d 587 (1994). Accordingly, ATT's motion to dismiss Count IX is **ALLOWED.**

#### 5. *Tortious Interference with Contractual Relations (Count X)*

Count X alleges that ATT tortiously interfered with IMR's contractual relationships with various location owners by attempting to collect charges for fraudulent calls from IMR's pay phones, by its failure to assist IMR in blocking fraudulent calls and by aggressively marketing its 10XXX access code. ATT is correct that these allegations fail to state a claim.

To establish a claim for tortious interference with contractual relationship, IMR must show that (1) It had a contract with a third party, (2) that ATT knowingly induced the third party to break the contract, (3) that ATT had an improper motive or means for doing so, and 4) that IMR was harmed by

---

**29.** IMR fails to explain how this last claim could conceivably constitute an unfair or deceptive practice within the meaning of ch. 93A.

such actions. *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272–273, 571 N.E.2d 1363 (1991).

The complaint fails to state a claim because it is bereft of any indication of how the alleged conduct could have caused a third party to breach a contract with IMR. While IMR alleges that ATT's actions caused it to breach contracts with location owners by removing pay phones prior to the expiration of location leases, it does not explain how its problems with fraudulent calls could have induced location owners to breach their contracts with IMR. It was IMR, not the location owners, which lost money as a result of the fraudulent calls. Mere allegations of direct harm to IMR are not sufficient to state a claim under this theory. Accordingly, ATT's motion to dismiss Count X is **ALLOWED**.

### 6. *Breach of Duty of Care (Count XI)*

 In Count XI, IMR alleges that ATT breached a "duty of care" which it had to IMR by dint of their contractual relationship. In particular, IMR alleges that ATT breached a duty to "take all reasonable steps" to prevent IMR's payphones from being used to make fraudulent calls through ATT's network.

This claim fails because ATT's duty to its customers, which is determined by its filed tariff, does not include a duty to prevent fraudulent calls made from customer owned equipment. *See Chartways, supra*, 8 F.C.C.R. 5601 at ¶ 16. Even if it did, damages are not available under a negligence theory for purely commercial, non-physical harms. *Bay State–Spray*, 404 Mass. at 107, 533 N.E.2d 1350. Accordingly, ATT's motion to dismiss Count XI is **ALLOWED**.

### 7. *Declaratory Judgment (Count XII)*

IMR seeks a judgment declaring all of the aforementioned allegations against ATT to be unlawful. Because I find that IMR has failed to state any claim in this action except with respect to allegations in Count VII concerning operator assisted long-distance calls, I will **ALLOW** ATT's motion to dismiss Count XII, except with respect to the allegations concerning operator-assisted calls described in Count VII.

## VI. CONCLUSION

For the foregoing reasons, I hold as follows: NET's Motion to Dismiss the Complaint in No. 90–12866 is **ALLOWED** with respect to Counts VII through XI and **DENIED** with respect to the remaining counts. IMR's Motion Pursuant to Rule 56(f) is **ALLOWED**, to the extent described in Part V.B, *supra*. ATT's Motion to Dismiss the Complaint in No. 92–10919 is **ALLOWED** in its entirety, except with respect to Counts VII and XII, as described in Parts V.C.3 and V.C.7, *supra*.

**SO ORDERED.**

### *ORDER*

Before me are the following motions:

New England Telephone and Telegraph Company's Motion to Dismiss the Amended Third–Party Complaint in No. 90–12866, filed on February 4, 1992;

American Telephone & Telegraph Company's Motion for Summary Judgment in No. 90–12866, filed on April 28, 1992;

IMR Capital Corporation's Motion for an Extension of Time, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure in No. 90–12866, filed on May 12, 1992; and,

American Telephone and Telegraph Company's Motion to Dismiss the Complaint in No. 92–10919, filed on June 3, 1992.

For the reasons set forth in the accompanying Memorandum and Decision, these Motions are disposed of as follows:

New England Telephone and Telegraph Company's Motion to Dismiss the Complaint in No. 90–12866 is **ALLOWED** with respect to Counts VII through XI, and **DENIED** with respect to Counts I through VI and Count XII.

IMR Capital Corporation's Motion for an Extension of Time, pursuant to Rule 56(f) is **ALLOWED** under the following conditions: IMR Capital Corporation will have 120 days from the date of this Order to conduct depositions of personnel of American Telephone and Telegraph Company. The scope of such depositions will be limited to questions in the following subject area: American Telephone

and Telegraph Company's practices, policies, and procedures for routing, handling, screening, recording and billing operator-assisted calls. IMR Capital Corporation is directed to file its opposition to all issues raised in American Telephone and Telegraph Company's Motion for Summary Judgment within 45 days of the end of this 120 day period.

The Court will defer disposition of American Telephone and Telegraph Company's Motion for Summary Judgment, pending the filing of IMR Capital Corporation's response, as described above.

American Telephone and Telegraph Company's Motion to Dismiss the Complaint in No. 92–10919 is **ALLOWED** in its entirety, except that it is **DENIED** with respect allegations in Counts VII and XII relating to unreasonable billing for operator-assisted calls under 47 U.S.C. § 201(b).

**SO ORDERED.**